

FILED
2023 Jan-31  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| DAVIS PRODUCT CREATION AND CONSULTING, LLC d/b/a BEESNTHINGS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Civil Action Number: 1:19-cv-00848-CLM |
| | ) | |
| BRIAN BLAZER d/b/a CARPENTER BEE SOLUTIONS, | ) ) ) | |
| Defendant. | ) | |

---

**BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT BY PLAINTIFF DAVIS PRODUCT CREATION AND CONSULTING, LLC d/b/a BEESNTHINGS**

---

C. Gregory Burgess
Jeremy A. Smith
**LANIER FORD SHAVER & PAYNE P.C.**
Post Office Box 2087 (35804)
2101 West Clinton Avenue, Suite 102
Huntsville, Alabama 35805
Telephone Number: (256) 535-1100
Facsimile Number: (256) 533-9322
Email: cgb@lanierford.com
jas@lanierford.com

**Attorneys for Plaintiff, Davis Product Creation
and Consulting, LLC d/b/a BeesNThings**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     PROCEDURAL HISTORY .......................................................................... 1

III.    STATEMENT OF UNDISPUTED FACTS ................................................. 2

IV.     STANDARD OF REVIEW ........................................................................... 8

V.      ARGUMENT ............................................................................................... 10

        A.      The '421 Patent is Invalid ............................................................... 10

        B.      Claims 13-21 are Invalid for Failing to Meet the Original Patent
                Requirement of 35 U.S.C § 251 ...................................................... 14

        C.      The Natural Carpenter Bee Trap Does Not Infringe the '421 Patent
                .......................................................................................................... 27

        D.      Blazer violated Ala. Code § 8-12A-1 et. seq. ................................. 31

VI.     CONCLUSION ............................................................................................ 35

Plaintiff Davis Product Creation and Consulting, LLC d/b/a BeesNThings ("DPCC") submits this brief in support of its motion for partial summary judgment (Doc. 160) in Civil Action Number: 1:19-cv-00848-CLM.

## I.    INTRODUCTION

This is a patent infringement case involving carpenter bee traps. In its motion for partial summary judgment, DPCC seeks summary judgment on Count VII of Defendant Brian Blazer's ("Blazer") Counterclaim in its entirety as U.S. Patent No. RE46,421 (the "'421 Patent") is invalid on multiple grounds and none of the Accused Traps (as defined herein) infringe the '421 Patent. DPCC also seeks summary judgment on Count II of its Consolidated Complaint against Blazer.

## II.    PROCEDURAL HISTORY

This case is the result of two (2) actions being consolidated. The first action was filed by DPCC on June 3, 2019. The second action was also filed by DPCC on February 2, 2021. On May 7, 2021, in response to DPCC's motion to consolidate the two (2) actions, the Court consolidated them. (Doc. 10). Eventually, after denying Blazer's ill-founded motion to dismiss (Docs. 112-113) certain claims, DPCC filed its Consolidated Complaint on January 7, 2022 and thereafter Blazer answered/counterclaimed on February 4, 2022 (the "Counterclaim") (Docs. 115 and 117, respectively).

On January 30, 2023, DPCC filed a motion for partial summary judgment pursuant to Rule 56 of the <u>Federal Rules of Civil Procedure</u>. (Doc. 160).[1] This brief is filed in support of that motion in accordance with Appendix II of the Court's initial order.

## III.   STATEMENT OF UNDISPUTED FACTS

1.      Blazer's original patent, U.S. Patent No. 8,375,624 (the "'624 Patent"), was issued on February 19, 2013. (<u>See</u> Doc. 161-1).

2.      The '421 Patent is a reissue of the '624 Patent. (<u>See</u> Doc. 161-2).

3.      The '421 Patent was issued on June 6, 2017. (<u>Id.</u>).

4.      The '624 Patent had one independent claim 1. (Doc. 161-1 at col. 7, ll. 18-34; col. 8, ll. 1-3). All other claims depended from claim 1. (<u>Id.</u>).

5.      Claim 1 of the '624 Patent required a receptacle adapter and receptacle to be "substantially located at the bottom" of the trap unit (i.e., bee trap). (<u>Id.</u> at col. 7, ll. 29-30). Claim 1 of the '624 Patent also required the receptacle attached to the trap unit be "clear or translucent". (<u>Id.</u> at col. 7, ll. 30-31).

6.      The '421 Patent is broader than the '624 Patent in at least two material respects. (<u>Compare</u> Doc. 161-1 at col. 7, ll. 18-34; col. 8, ll 1-31 <u>with</u> Doc. 161-2 at col. 7, ll. 40-67, col. 8, ll. 1-67; col. 9, ll. 1-2).

---

[1] This is a renewed motion for partial summary judgment filed by DPCC in accordance with the Court's amended scheduling order. (Doc. 152). DPCC's initial motion for partial summary judgment was mooted by the Court with the consent of the parties due to an intervening change in the law. (Doc. 153).

7.     First, new independent claim 13 of the '421 Patent removed the claim limitation on the location of the receptacle adapter. Unlike the requirement of the '624 Patent, the location of the receptacle is not limited to the bottom of the bee trap (or trap unit) in the '421 Patent. (Id.).

8.     Second, the '421 Patent removed the claim limitation that the receptacle be "clear or translucent." (Compare Doc. 161-1 at col. 7, ll. 54-55 with Doc. 161-2 at col. 8, ll. 35-40).

9.     On December 14, 2020, the Court issued a claim construction (or *Markman*) order construing certain claim terms in the '421 Patent. (Doc. 161-3).

10.    The Court defined "a receptacle adapter" as a device that is part of the trap entrance unit that receives the receptacle and attaches the receptacle to the trap. (Id. at pg. 21). On November 16, 2022, the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit"), in Appeal No. 2022-1033, defined "receptacle adapter" as a "structure configured to receive and help retain a receptacle." (Doc. 161-21 at pg. 11).

11.    Claim 13 of the '421 Patent requires that an infringing trap comprise a receptacle adapter located at the exit opening of the trap entrance unit, wherein the receptacle adapter is adapted to receive at least one receptacle. (Doc. 161-2 at col. 8 ll. 35-41).

12.     All of the remaining claims of the '421 Patent are dependent claims that depend from either claim 1 or claim 13. (Id. at col. 8 ll. 42-67, col. 9 ll. 1-2).

13.     Blazer has a long history of claiming infringement of the '421 Patent against any party who dares to sell a carpenter bee trap. See, e.g., *Brian Robert Blazer v. Best Bee Brothers LLC et al*., Case No. 2:20-cv-00480-BHL [pending in the Eastern District of Wisconsin]; *Brian Blazer v. Lowe's Companies, Inc*., Case No. 6:20-cv-00276-ADA [pending in the Western District of Texas]; *Brian Blazer d/b/a Carpenter Bee Solutions v. The Home Depot U.S.A., Inc*., Case No. 6:20-cv-00285-ADA [pending in the Western District of Texas]; *Blazer v. Chrisman Mill Farms LLC*, Case No. 5:17-cv-00430-REW-MAS [filed in the Eastern District of Kentucky]; *Blazer v. Amazon.com, Inc.*, Case No. 1:15-cv-01063-SGC [filed in the Northern District of Alabama]; Blazer v. Ebay Inc., Case No. 1:15-cv-01059-KOB [filed in the Northern District of Alabama] and finally *Blazer v. Chrisman Mill Farms LLC*, Case No. 1:17-cv-00320-VEH [filed in the Northern District of Alabama]. (See Docs. 161-4 through 161-10, generally).

14.     On February 21, 2018, Mr. Joseph Gleason ("Gleason"), on behalf of Blazer, submitted a notice to Amazon.com ("Amazon") alleging that certain of DPCC's carpenter bee traps, specifically side-mounted traps being sold on Amazon, infringe the '421 Patent. (Doc. 161-11).

15.    On March 2, 2018, counsel for DPCC informed Gleason by letter of DPCC's absolute intervening rights, pursuant to 35 U.S.C. § 252, to sell or offer to sell its remaining inventory of side-mounted traps. (Doc. 161-12).

16.    The March 2, 2018 letter included, as attachments, certain documents showing that DPCC ordered, had manufactured, paid for, and received an inventory of side-mounted traps before the June 6, 2017 date the '421 Patent was reissued. (Id. at pp. 5-15).

17.    On March 28, 2019, Blazer sent The Home Depot, Inc. ("Home Depot") an email alleging that in some manner DPCC was infringing the '421 Patent. (Doc. 161-13).

18.    On May 9, 2019, Blazer, through counsel, sent Home Depot a letter alleging that a side-mounted carpenter bee trap produced by DPCC and sold by Home Depot infringed the '421 Patent (the "Home Depot Letter"). (Doc. 161-14).

19.    On April 9, 2020, Blazer sued Home Depot in the Western District of Texas for patent infringement based in part on the sale/offer for sale of DPCC's side-mounted bee trap (the "Home Depot Suit"). (Doc. 161-6).

20.    On April 13, 2020, DPCC moved the Court for partial summary judgment to establish DPCC's absolute intervening rights in regard to its side-mounted bee traps. (Doc. 161-15, hereinafter "DPCC's MSJ for Intervening Rights").

21.     After almost nine (9) months and after taking DPCC's deposition, Blazer responded to DPCC's MSJ for Intervening Rights and (i) did not dispute any of the material facts set forth in DPCC's motion and (ii) stipulated that DPCC had absolute intervening rights in side-mounted bee traps purchased or manufactured before June 6, 2017. (Doc. 161-16, pp. 1, 4-6).

22.     On February 8, 2021, the Court granted DPCC's MSJ for Intervening Rights. (Doc. 71).

23.     Blazer, in Count VII of his Counterclaim, has alleged infringement of the '421 Patent. Further, in his Supplemental Infringement Contentions, Blazer alleges that a certain carpenter bee traps, namely the "Carpenter Bee Natural Bee Trap" infringes various claims, namely claims 13-17 (the "Asserted Claims") of the '421 Patent. (See Doc. 117 at 58-61; Doc. 161-17).

24.     U.S. Patent No. 5,231,792 to Warner ("Warner") is prior art to the '421 Patent. (Doc. 161-18 at Tab 2).

25.     U.S. Patent Pub. No. 2004/0231228 to Pazik ("Pazik") is prior art to the '421 Patent. (Doc. 161-18 at Tab 3).

26.     U.S. Patent Pub. No. 2008/0052982 to Windsor ("Windsor") is prior art to the '421 Patent. (Doc. 161-18 at Tab 4).

27.     Development and Evolution of Division of Labor and Foraging Specialization in a Social Insect, Page *et al*., Current Topics in Developmental

Biology, 2006:74:253-86, Elsevier ("Page"), is prior art to the '421 Patent. (Doc. 161-18 at Tab 5).

28.　　U.S. Patent No. 6,766,611 to Prince ("Prince") is prior art to the '421 Patent. (Doc. 161-18 at Tab 6).

29.　　U.S. Patent No. 7,757,432 to Gunderman, Jr. ("Gunderman") is prior art to the '421 Patent. (Doc. 161-18 at Tab 7).

30.　　Dr. George L. Rotramel ("Dr. Rotramel") is a person having ordinary skill in the art, or a PHOSITA given his background, education and experience. (Doc. at 161-18 at pg. 3).

31.　　Clifford Davis, Jr. ("Davis") is the managing member of DPCC. (Doc. 161-19). For a period of time, DPCC sold a bee trap referred to by Blazer as the "Carpenter Bee Natural Bee Trap." (Id.). That trap features a housing and a receptacle. (Id.). The receptacle was attached to the receptacle by two (2) screws which passed upwardly through opposing channels in the receptacle. (Id.). There was no other means of attaching the receptacle to the housing. (Id.).

32.　　Anthony Robinson ("Robinson") was once a friend and business associate of Blazer and licensed the '421 Patent from Blazer. (Doc. 161-20 at pg. 14, ll. 13-23 and pg. 14, ll. 1-13). However, at some point, the relationship ended and they ended up in litigation. (Id. at 18, ll. 12-20).

7

33.     During the time in which Robinson and Blazer were friends/associates, Blazer told Robinson that he had a deep-seated hatred for Davis and wished him "to be dead." (Id. at pg. 26, ll. 4-23, pg. 27, ll. 1-23). Further, Blazer went on to describe a way of killing Davis by applying cobra venom "on a steering wheel." (Id. at pg. 27, ll. 22-23).

## IV.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party carries the initial burden of "informing the district court of the basis for its motion and . . . demonstrat[ing] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party establishes that it is entitled to a judgment as a matter of law, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. Id. at 324. To meet its shifting burden, the nonmoving party may not rest upon the mere allegations in its complaint, but must (A) cite to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations..., admissions, interrogatory answers, or other materials; or (B) show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. See

Fed. R. Civ. P. 56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). To create a genuine dispute for trial within the meaning of rule 56, the nonmoving party must produce evidence that is not "merely colorable" but instead is "significantly probative" of a disputed fact. Id. at 249-50. Thus, "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). In ruling on summary judgment, the district court "must review all evidence and make all reasonable inferences in favor of the [nonmoving party]." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). But, importantly, "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." Nance v. Bracy, 2012 WL 2479616, at *1 (N.D. Ala. June 22, 2012) (Smith, J.). Summary judgment is as available in patent cases as in other areas of litigation. Continental Can Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264 (Fed. Cir. 1991). Further a party filing a summary judgment motion need not produce evidence demonstrating absence of a genuine issue of material fact for issues on which the opposing party bears the burden of proof at trial; the accused infringer need only argue non-infringement and identify claim limitations which are not met. Exigent Technology, Inc. v. Atrana Solutions, Inc., 442 Fed. 3d 1301 (Fed. Cir. 2006).

## V.    ARGUMENT

### A.    The '421 Patent is Invalid.

The Asserted Claims of the '421 Patent are invalid under 35 U.S.C. § 103 over various combinations of the prior art of record in this case.

A patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103. An obviousness analysis is based on several factual inquiries. A court must examine the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). At that point, a court may consider secondary objective evidence of non-obviousness, such as commercial success, long felt but unsolved need, failure of others, and the like. Id.

In KSR Int'l Co. v. Teleflex, Inc., the Supreme Court stated that an invention may be found obvious if it would have been obvious to a person having ordinary skill to try a course of conduct:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that

instance the fact that a combination was obvious to try might show that it was obvious under § 103.

550 U.S. 398, 421(2007).

First, an invention would not have been obvious to try when the inventor would have had to try all possibilities in a field unreduced by direction of the prior art. When "what would have been 'obvious to try' would have been to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful," an invention would not have been obvious. In re O'Farrell, 853 F.2d 894, at 903 (Fed. Cir. 1988). This is another way to express the KSR prong requiring the field of search to be among a "finite number of identified" solutions.

In this case, the Asserted Claims of the '421 Patent are invalid as set forth in the Declaration of Dr. George L. Rotramel ("Dr. Rotramel"). (Doc. 161-18). As detailed by Dr. Rotramel, the combination of Pazik, Windsor, Warner & Page teach and/or suggests each and every limitation of the Asserted Claims as a PHOSITA would have been motivated to look to the teachings of Windsor, Warner and Page to improve the trap of Pazik. A PHOSITA would have been motivated to combine the teachings of these prior art references as they all relate to the same field, namely insect traps, and the elements to be combined would have been expected to maintain their respective properties/functions after they have been combined, a PHOSITA

would have recognized the value of combining the elements of each prior art reference and would have known how to do so.

The Asserted Claims are invalid over the combination of Prince, Pazik, Windsor and Warner as a PHOSITA would have been motivated to look to the teachings of Pazik, Windsor and Warner to improve the trap of Prince. A PHOSITA would have been motivated to combine the teachings of these prior art references as they all relate to the same field, namely insect traps, the elements to be combined would have been expected to maintain their respective properties/functions after they have been combined, and a PHOSITA would have recognized the value of combining the elements of each prior art reference and would have known how to do so.

The Asserted Claims are invalid over the combination of Gunderman, Pazik, Windsor and Warner as a PHOSITA would have been motivated to look to the teachings of Pazik, Windsor and Warner to improve the trap of Gunderman. A PHOSITA would have been motivated to combine the teachings of these prior art references as they all relate to the same field, namely insect traps, the elements to be combined would have been expected to maintain their respective properties/functions after they have been combined, and a PHOSITA would have recognized the value of combining the elements of each prior art reference and would have known how to do so. A PHOSITA would have been motivated to combine the

teachings of these prior art references as they all relate to the same field, namely insect traps, the elements to be combined would have been expected to maintain their respective properties/functions after they have been combined, and a PHOSITA would have recognized the value of combining the elements of each prior art reference and would have known how to do so.

The Asserted Claims are invalid over the combination of Windsor, Pazik and Warner as a PHOSITA would have been motivated to look to the teachings of Windsor and Warner to improve the trap of Pazik. A PHOSITA would have been motivated to combine the teachings of these prior art references as they all relate to the same field, namely insect traps, the elements to be combined would have been expected to maintain their respective properties/functions after they have been combined, and a PHOSITA would have recognized the value of combining the elements of each prior art reference and would have known how to do so.

The Asserted Claims are invalid over the combination of Prince, Pazik, Windsor, Warner and Page as a PHOSITA would have been motivated to look to the teachings of Pazik, Windsor, Warner and Page to improve the trap of Prince. A PHOSITA would have been motivated to combine the teachings of these prior art references as they all relate to the same field, namely insect traps, the elements to be combined would have been expected to maintain their respective properties/functions after they have been combined, and a PHOSITA would have

recognized the value of combining the elements of each prior art reference and would have known how to do so.

The combinations of prior art cited above and discussed by Dr. Rotramel merely combine known elements taught in the prior art to achieve the expected results, which render the Asserted Claims obvious. Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356 (Fed. Cir. 2008) (A claimed invention is likely to be obvious if it is a combination of known prior art elements that would reasonably have been expected to maintain their respective properties or functions after they have been combined.); Ecolab, Inc. v. FMC Corp., 569 F.3d 1335 (Fed. Cir. 2009) (A combination of known elements would have been prima facie obvious if an ordinarily skilled artisan would have recognized an apparent reason to combine those elements and would have known how to do so.)

**B.   Claims 13-21 are Invalid for Failing to Meet the Original Patent Requirement of 35 U.S.C § 251.**

The reissue statute, 35 U.S.C. § 251, permits a patentee to correct errors in a patent, including claiming the invention more narrowly than the scope of the original disclosure. The reissue process can also improperly lead to reissue claims that are broader than what was originally conceived in an effort to capture the improvements made by others during the two-year window (so-called design around improvements). To prevent such abuse, and to protect the public's reliance on the disclosure and scope of an original patent, the reissue statute prohibits a patentee

from obtaining, through reissue, rights to any invention other than "the invention disclosed in the original patent." 35 U.S.C. § 251(a). This "original patent" requirement prevents a patentee from obtaining rights to a competitor's improvements by limiting reissue claims to subject matter that was **explicitly** disclosed on the face of an original specification, and forbids claims to subject matter that may only have been suggested.

Unsatisfied with the scope of the '624 Patent, Blazer drastically changed and the scope of his claims through reissue thereby extensively broadening the claims in an attempt to cover certain bee traps sold by DPCC. In so doing, Blazer violated 35 U.S.C. § 251. DPCC explains in detail below.

"[T]he federal patent system . . . . promotes disclosure of inventions, to stimulate further innovation" by the public. Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979). The reissue statute's original patent requirement protects members of the public who properly rely on the claims and explicit disclosure of an issued patent when further innovating in a manner that avoids that patent—the original patent requirement limits the scope of reissue claims to cover only subject matter that was unequivocally disclosed in the issued patent. See Antares Pharma, Inc. v. Medac Pharma, Inc., 771 F.3d 1354 (Fed. Cir. 2014). A patent applicant typically seeks patent claims that are as broad as is permitted by the patent laws. If an applicant files a patent application disclosing and claiming one invention and later

realizes that the specification discloses a second or broader invention, the applicant may seek coverage of those other claims in the original application or in a continuing application. Antares Pharma, 771 F.3d at 1358. If the realization regarding an unclaimed embodiment occurs after issuance of the original and continuing applications, however, "an applicant can only seek to add claims by filing a reissue application." Id. (citing 35 U.S.C. § 251).

"In enacting the [reissue] statute, Congress provided a statutory basis for the correction of 'error.'" In re Weiler, 790 F.2d 1576, 1579 (Fed. Cir. 1986). "The reissue statute was not enacted as a panacea for all patent prosecution problems, nor as a grant to the patentee of a second opportunity to prosecute de novo his original application." Id. at 1582. An applicant's "delay [to reissue] in seeking to broaden the claims is not without cost." Antares Pharma, 771 F.3d at 1358. By waiting until after the patent is issued, the applicant becomes subject to several additional requirements: first—and relevant here—the reissue claims must satisfy the original patent requirement of 35 U.S.C. § 251(a), which precludes a patentee from obtaining a reissue to any invention other than "the invention disclosed in the original patent"; Antares Pharma, 771 F.3d at 1358.

The original patent requirement is a long-existing doctrine that was recently reaffirmed by the Federal Circuit in Forum US, Inc. v. Flow Valve, LLC, 926 F.3d 1346 (Fed. Cir. 2019). In Forum US, the patent holder Flow Valve sued Forum US

for infringement of a reissue patent involving a device to hold articles during machining. Id. at 1348-50. During the pendency of the reissue patent, Flow Valve added several new claims that removed a limitation from the original claims. Id. at 1349-50. Specifically, a claim limitation that the device contain a plurality of arbors (which were useful to manipulate the articles during the machining process) was removed. Id. Forum US, the accused infringer, filed a motion for summary judgment on the basis that the reissue claims violated the "original patent rule" of 35 U.S.C. § 251. The trial court granted summary judgment and the Federal Circuit affirmed. The Federal Circuit initially noted that whether a reissue patent complies with 35 U.S.C. § 251 is a matter of law for the court to decide. Id. at 1350. The Federal Circuit noted "[i]t is well settled that for broadening reissue claims, 'it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification.'" Id. at 1351; see also Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U.S. 38, 42-43, 14 S.Ct. 28, 37 S.Ct. 989 (1893) ("[T]o warrant new and broader claims in a reissue, such claims must not be merely suggested or indicated in the original specification, drawings, or models, but it must further appear from the original patent that they constitute parts or portions of the invention, which were intended or sought to be covered or secured by such original patent."). Congress codified this long-standing requirement, which became known as the "same invention" requirement. Forum US, 926 F.3d at 1351.

17

The Federal Circuit went on to note that "for broadening reissue claims, the specification of the original patent must do more than merely suggest or indicate the invention recited in reissue claims; it must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original." Id. at 1351. Stated differently, the original patent "must clearly and unequivocally disclose the newly claimed invention as a separate invention." The Federal Circuit found that the patent specification did not even "suggest" an arbor-less embodiment of the disclosed invention nor did it "clearly and unequivocally" disclose such an embodiment; thus, the reissue patent violated the original patent rule. Id. at 1352-53. In reaching its conclusion, the court in Forum US followed precedent set by a prior Federal Circuit decision, Antares Pharma, Inc v. Medac Pharma, Inc., 771 F.3d 1354 (Fed. Cir. 2014). In Antares Pharma, Antares asserted several claims from a reissue patent against the defendant, Medac. Id. at 1356-57. The original claims of the patent at issue covered a "Needle Assisted Jet Injector" system for injecting medicine in which a needle punctures the skin before forcefully expelling the medicine (unlike other jet injectors in which the medicine itself ruptures the skin). Id. During the prosecution of the original claims, the applicants repeatedly focused on the "jet injector" in their original claims. Id. at 1357-59. Subsequently, Antares obtained a reissue patent in which claims 23-37 were not limited to jet-injection devices and instead focused on various safety features for any

18

injection devices. Id. at 1357. Once a patent has issued, if there are no pending continuation or divisional applications, the applicant can only seek to add claims by filing a reissue application.

The Antares court discussed at length the Supreme Court's "definitive explanation of the original patent requirement" in U.S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668 (1942). In U.S. Industrial, the patent related to a process for the production of a chemical compound. The original claims included numerous process steps and required the presence of water as a catalyst. Id. The patentee subsequently obtained a reissue patent covering similar process steps but omitting the water catalyst requirement, claiming that it was included in error. Id. The Supreme Court found that the reissue patent was "not for the same invention described and claimed and intended to be secured by the original patent and is, therefore, void." U.S. Industrial, 315 U.S. at 681. In reaching its decision, the Supreme Court explained that reissue claims would satisfy the original patent requirement "if the broader claims in the reissue are not merely suggested or indicated in the original specification but constitute parts or portions of the invention which were intended or sought to be covered or secured by the original patent." Id. at 676. The Court went on to hold:

> It will not aid the patentee that the new matter covered by the reissue was within his knowledge when he applied for his original patent. And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the

specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original.

Id. Applying the Industrial Chemicals standard, the Antares court found that the reissue claims related to the safety features for injection devices were invalid. Antares, 771 F.3d at 1362. The original claims required the "jet injection" limitation and the asserted reissue claims focused on safety features and did not contain the "jet injection" limitation. The Federal Circuit found that the original specification did not adequately disclose the claimed safety features to meet the Industrial Chemicals standard. "Although safety features were mentioned in the specification, they were never described separately from the jet injector...." Id. at 1363. For example, a push button safety feature was mentioned in only one passage in the specification. Id. The passing references to safety features were mere suggestions or indications "of alternative inventions … not sufficient to satisfy the original patent requirement of § 251.... Nowhere does the specification disclose, in an explicit and unequivocal manner, the particular combinations of safety features claimed on reissue, separate from the jet injection invention." Id. Accordingly, the reissue claims were invalid for failure to satisfy the original patent requirement of 35 U.S.C. § 251. Id.

Under the applicable law and the undisputed facts, the '421 Patent violates the original patent rule codified in 35 U.S.C. § 251. As above, the '421 Patent removed

two (2) limitations from the new claims added during the reissue process thus impermissibly broadening the scope of the claims in the '421 Patent when compared to the '624 Patent. Namely, during the reissue process, Blazer removed two (2) limitations from the new independent claim 13: first, that the receptacle adapter and receptacle be on the bottom of the bee trap (or trap unit), and second, that the receptacle be "clear or translucent." This is the exact type of broadening condemned by Federal Circuit in <u>Forum US</u>, *supra.*

In this case, the specification only discloses a bee trap with a receptacle adapter and receptacle at the bottom of the bee trap unit, a clear receptacle and a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light.

The specification of the '421 Patent is very clear: the receptacle and receptacle adapter must be located on the bottom of the bee trap (or trap unit). Simply put, each and every embodiment of the bee trap that is either described or shown in the '421 Patent requires that the receptacle adapter and receptacle be at the bottom of the bee trap unit. There is no "clear" or "unequivocal" disclosure of the embodiment of the bee trap claimed in the reissue patent. <u>See</u> <u>Flow Valve</u>, *supra*; <u>Antares Pharma, Inc</u>., *supra*.

The table below is illustrative of the required location of the receptable location requirement as broadened by the '421 Patent:

| Cite within '421 Patent | Description of location of receptacle adapter and/or receptacle |
|---|---|
| Col. 2, ll. 54-58 | "The at least one receptacle adapter allows convenient attachment, removal, and replacement of receptacles. The area surrounding the at least one receptacle adapter is sloped such that gravity aids in the conveyance of bees into the at least one receptacle." |
| Col. 3, ll. 41-44 | "The trap entrance unit is preferably hollow and box-like, with 4 side panels, a roof panel that overhangs at least one side to shelter at least one entrance hole, and a sloped bottom surface, that form a plenum which promotes the passage of bees from the at least one entrance hole to the at least one receptacle adapter coupling and into an attached receptacle." |
| Col. 4, ll. 60-62 | "A clear sloping bottom section 15 directs bees to receptacle adapter coupling 14, and into clear plastic receptacle 18." |
| Col. 5, ll. 2-5 | "At the bottom of trap entrance unit 1 is reducer section 4 made of clear plastic with adapter coupling 5 at the bottom which accepts a clear plastic removable receptacle 6." |
| Col. 5, ll.27-29 | "Attracted by the light, the bees immediately fly to the bottom of the trap where they are quickly funneled into the receptacle 6." |

| Cite within '421 Patent | Description of location of receptacle adapter and/or receptacle |
|---|---|
| Col. 5, ll. 62-65 | "Clear bottom section 25, adapter coupling 24, and receptacle 28 are similar to respective parts 15, 14, and 18 of trap entrance unit 1 in FIG. 1." |
| Col. 6, ll. 4-10 | "Entrance hole 31 is in the bottom of the block and connects to horizontal bore 33 and large vertical bore 34 to form a plenum resembling a natural carpenter bee nest. Vertical bore 34 is sized to allow the insertion of receptacle 38 which is retained by friction. Optionally vertical bore 34 may be threaded or fitted with a threaded insert to positively retain receptacle 38." |
| Col. 6, ll. 42-45 | "A receptacle adapter 44 at the bottom of vertical bore 43 is a friction fit similar to bore 34 in trap entrance unit 3 and allows convenient insertion and removal of clear receptacle 48." |

Further, every single one of the figures in the '421 Patent show the receptacle adapter and receptacle at the bottom of the bee trap unit. (Ex. B). Figures 1A, 1B, 2A, 2B, 3A, 3B, 4A, 4B and 5A from the '421 Patent are illustrative (with added arrows):



.

Further, the '421 Patent also only teaches a clear or translucent receptacle. There is neither a clear nor an unequivocal disclosure of any other receptacle in the specification nor is there any suggestion thereof. Again, every mention of the receptacle and/or receptacle adapter refers to those features as being clear, translucent or some nearly identical trait. Again, as recognized by both the Federal

Circuit and the Supreme Court, absent an explicit and unequivocal disclosure of the claimed invention, the '421 Patent violates the original patent rule. The table below is instructive:

| Cite within '421 Patent | Description of location of receptacle adapter and/or receptacle |
|---|---|
| Col. 2, ll. 58-67; col. 3, ll. 1-2. | "Further the material of the at least one receptacle and optionally the area surrounding the at least one receptacle adapter has a degree of transparency such that ambient light is admitted in excess of other sources of light within the trap entrance unit plenum. Bees that enter the trap entrance unit plenum will immediately identify the brightly lit at least one receptacle adapter as an exit route at which point they enter the at least one receptacle. As a result, bees trapped in the at least one receptacle only try to escape through the transparent walls of the receptacle and do not attempt to return to the dimly lit trap entrance unit plenum. |
| Col. 3, ll. 11-14. | "The trapped bees tend to pack in tightly and a 16 fluid ounce size receptacle will hold hundreds of bees. Plastic beverage bottles employed as receptacles also provide a positive barrier that can be handled without fear of contact with the trapped bees." |
| Col. 4, ll. 60-63. | "A clear sloping bottom section 15 directs bees to receptacle adapter coupling 14, and into clear plastic receptacle 18." |

| Cite within '421 Patent | Description of location of receptacle adapter and/or receptacle |
|---|---|
| Col. 5, ll. 2-5. | "At the bottom of trap entrance unit 1 is reducer section 4 made of clear plastic with adapter coupling 5 at the bottom which accepts a clear plastic removable receptacle 6." |
| Col. 5, ll. 8-9. | "The disposable receptacle 6 is also a standard PET beverage bottle." |
| Col. 5, ll. 24-29. | "When bees enter trap entrance unit 1, they immediately see the ambient light entering from the clear plastic reducer 4 as well as from receptacle 6 through the opening in adapter coupling 5. Attracted by the light, the bees immediately fly to the bottom of the trap where they are quickly funneled into the receptacle 6." |
| Col. 5, ll. 39-43. | "A further advantage of the clear plastic construction of the reducer and collection bottle is that it allows the user to easily monitor the activity within the trap to gauge the effectiveness of deployment as well as to monitor the level of dead insects within the receptacle." |
| Col. 5, ll. 60-64. | "Clear bottom section 25 has top edges that are folded outward and secured to front side 263 and back side 262 by nails and tack strips 251. Clear bottom section 25, adapter coupling 24, and receptacle 28 are similar to respective parts 15, 14, and 18 of trap entrance unit 1 in FIG. 1." |

| Cite within '421 Patent | Description of location of receptacle adapter and/or receptacle |
|---|---|
| Col. 6, ll. 12-16. | "Receptacle 38 is constructed of a clear material that reflects and refracts ambient light up into vertical bore 34 such that bees entering entrance hole 31 are immediately attracted by the light ant crawl through the plenum and into receptacle 38." |
| Col. 6, ll. 42-45. | "A receptacle adapter 44 at the bottom of vertical bore 43 is a friction fit similar to bore 34 in trap entrance unit 3 and allows convenient insertion and removal of clear receptacle 48." |

In summary, two very substantial limitations were removed from claim 13 resulting in a much broader scope of patent protection. Accordingly, as a matter of law, DPCC is entitled to summary judgment as to the invalidity of claims 13-21 of the '421 Patent as the '421 Patent violates the original patent rule set forth by 35 U.S.C. § 251 as set forth above. See, e.g., Ikorongo Tech. LLC v. Bumble Trading, LLC, 2022 WL 1094623 (W.D. Texas April 12, 2022) (finding patent invalid for having violated the original patent rule).

### C.   The Natural Carpenter Bee Trap Does Not Infringe the '421 Patent.

A determination of infringement, or lack thereof, of a U.S. patent requires a two-step analysis. PC Connector Solutions LLC v. SmartDiskCorp., 406 F.3d 1359, 1362 (Fed. Cir. 2005). First, the court must ascertain the scope of the claims as a

matter of law. Id.; Markman v. Westview Instruments, Inc., 52 F.3d 967, 970–71 (Fed. Cir. 1995). In the second step of infringement analysis, the court determines whether the properly construed claims cover the accused device, either literally or under the doctrine of equivalents. PC Connector, 406 F.3d at 1362, 1364. Although this second step is a question of fact, when there are no genuine issues of material fact in dispute, a grant of summary judgment is proper. Id. at 1364. Literal infringement requires that each and every claim limitation appear in an accused product. Bayer AG v Elan Pharm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1553 (Fed. Cir. 1989). Where literal infringement is not present, infringement under the doctrine of equivalents may be found where the "accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997). Each element contained in a patent claim is deemed to be material, and the doctrine of equivalents must be applied to each individual element of the claim, not to the invention as a whole. Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 29 (1997). To find infringement under the doctrine of equivalents, the accused product must contain each limitation of the claim in the patented invention or its equivalent. Id. at 40. "An element in the

accused product is equivalent to a claim limitation if the differences between the two are insubstantial. The analysis focuses on whether the element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." Aquatex Indus., Inc., 419 F.3d at 1382. However, the doctrine of equivalents applies only in exceptional cases and is not to be turned into in the second prong of every claim of infringement, regularly available to extend the scope of patent claims. Duncan Parking Techs., Inc. v. IPS Group, Inc., 914 F. 3d 1347, 1362 (Fed. Cir. 2019) The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988).

The '421 Patent contains two (2) independent claims, claims 1 and 13. (Doc. 161-2). Both of these claims require that an infringing bee trap contain a receptacle adapter. (Id.). That claim term was recently construed by the Federal Circuit. Specifically, the Court defined "a receptacle adapter" as "a structure configured to receive and help retain a receptacle" (Doc. 161-21 at 11). Claim 13 further requires that the receptacle adapter be "located at the exit opening of the trap entrance unit." (Doc. 161-2 at col. 8).

The Carpenter Bee Natural Bee Trap does not contain a receptacle adapter located at the exit opening of the trap entrance unit. Blazer has attempted to identify

the element E shown below as the "receptacle adapter" for this model trap. (Doc. 161-17 at pg. 22). For this trap, receptacle is/was attached to the housing by two (2) screws which passed upwardly through opposing channels in the receptacle and then into the housing. Further, element E is made of wood, and the natural behavior of wood is to expand and contract as temperatures change. It also swells and contracts as it's moisture level from rain or humidity increases or decreases. This makes wood a very poor "structure configured to receive and help retain a receptacle" as it could never reliably be precise enough to hold a receptacle which is why screws are needed to hold the plastic part to the trap body. But, even if the Court assumes that element E is a receptacle adapter (which it is not), it is not located at the exit opening of the trap entrance unit. Rather, part of what Blazer identifies as the receptacle adapter is, as shown below, practically as far away from the exit opening as is physically possible on the trap (as shown by the circled portions below).

 

Simply put, there is no way that element E as identified by Blazer is located at the exit opening of the trap entrance unit. Accordingly, DPCC's Carpenter Bee Natural Bee Trap does not infringe any of the Asserted Claims.[2]

> **D.      Blazer violated Ala. Code § 8-12A-1 et. seq.**

DPCC is entitled to summary judgment on liability as to Count II of its Consolidated Complaint. Indeed, the undisputed facts and the applicable law show that Blazer's continued claims of infringement of the '421 Patent, at least as they relate to DPCC's side-mounted traps, are meritless and both Blazer and his counsel knew or should have known that such claims were meritless yet they persisted in this campaign of harassment of DPCC and its customer. Blazer's actions are exactly what Ala. Code § 8-12A-1 (1975) is meant to prevent.

Ala. Code § 8-12A-1 *et. seq.* (1975) creates a statutory framework that protects Alabama residents against "bad faith" assertions of patent infringement. Id. at § 8-12A-2(a). Among other remedies, this statute gives the "target" of a bad faith

---

[2] Although Blazer is not claiming infringement under the doctrine of equivalents, he reserved the right to do so. That claim fails as well, however, as the Carpenter Bee Natural Bee Trap does not infringe the '421 Patent under the doctrine of equivalents. As discussed above, to find infringement under the doctrine of equivalents, the accused product must contain each limitation of the claim in the patented invention or its equivalent and an element in the accused product is equivalent to a claim limitation if the differences between the two are insubstantial. The analysis focuses on whether the element in the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation. The doctrine of equivalents applies only in exceptional cases and is not to be turned into in the second prong of every claim of infringement, nor is it regularly available to extend the scope of patent claims or to read out a claim limitation. In this case, there is no receptacle adapter located not located at the exit opening of the trap entrance unit.

assertion of patent infringement a cause of action for "a determination of whether the patent infringement assertion was made in bad faith." Id. A prevailing plaintiff under this statute may be entitled to equitable relief, damages, court costs and attorneys' fees and exemplary damages. Id. at (d). A "Demand Letter" is statutorily defined as "[a] letter … asserting or claiming that the target has engaged in patent infringement." Ala. Code § 8-12A-1(1) (1975).

Here, there is no doubt that the Home Depot Letter is a "Demand Letter." Further, a "Target" is defined as a person located in Alabama "that satisfies any of the following: … The customers of which have received a demand letter asserting that the person's product … has infringed a patent." Id. at (c). Once again, there is no doubt that DPCC is a "target" based upon the Home Depot Letter. Accordingly, DPCC is entitled to a determination that Blazer's allegations were in bad faith. There are a number of factors that a court may consider when determining whether an assertion of "patent infringement [was made] in bad faith." Ala. Code § 8-12A-2(e) (1975). The most important factors for purposes of this motion for summary judgment are the fact that Blazer's demand letter did not contain an address of the patent owner or factual allegations concerning the specific areas in which the target's products, services, and technology infringe the patent or are covered by the claims in the patent; the demand letter alleging patent infringement was meritless, and the person knew, or should have known, that the claim or assertion was meritless; and

the demand letter is deceptive along with other relevant factors. <u>Id.</u> Each of these factors is addressed below.

First, the Home Depot Letter did not contain either Blazer's address or any factual allegations concerning the specific areas, or ways, in which the side-mounted bee traps allegedly infringe the '421 Patent.

Second, Blazer and his counsel knew or at least should have known that the claims were meritless. Indeed, in this case, the very same side-mounted traps identified in the Home Depot Letter are the traps that this Court has granted DPCC absolute intervening rights to sell or offer for sale. What is more, the evidence provided by DPCC to Blazer in 2018 is nearly identical to, if not the same as, the evidence used to support DPCC's MSJ for intervening rights. (<u>Compare</u> Doc. 161 - 12, pp. 5-15 <u>with</u> Doc. 161-15, pp. 27-41). There was no way a reasonable person could argue that DPCC did not have intervening rights. Yet despite of this evidence, Blazer targeted DPCC, and DPCC's customer, the Home Depot, with meritless claims of patent infringement concerning DPCC's side-mounted traps. To be sure, those infringement claims were meritless because Blazer (and his attorneys) had actual or constructive knowledge that DPCC had absolute intervening rights in those side-mounted traps. Furthermore, Blazer never communicated with DPCC or its attorneys in any attempt to understand why DPCC has intervening rights. Rather, he continued on his relentless quest to claim infringement against DPCC—a quest that

he continues today. Blazer omitted the fact that DPCC claimed (and now has been granted) absolute intervening rights in the very traps subject of the Home Depot Letter rendering that letter deceptive.

Finally, there are two (2) additional relevant factors that illustrate Blazer's bad faith. First, Blazer's long and litigious past of claiming infringement of a myriad of designs of carpenter bee traps (see Docs. 161-4 through 161-10) illustrates his continued belief (that he refuses to change) that anyone who sells a carpenter bee trap of any design infringes his patent rights. Second, and perhaps most striking, is Blazer's desire to physically harm Davis. Blazer told Robinson that Blazer has a "deep seated hatred" for Davis, wished him dead and went so far as to concoct a method of harming/killing Davis using "cobra venom." (Doc. 161- 20). This final factor is probative and illustrative of Blazer's intent, no matter how or why, to create claims of patent infringement against DPCC. Taken together, all of these factors favor a finding of bad faith by Blazer.

Blazer's actions, including his refusal to acknowledge DPCC's absolute intervening rights, has caused DPCC to expend considerable resources to defend itself and its customer, Home Depot, from Blazer's bad faith claims of patent infringement. When applying the statutory framework of Ala. Code § 8-12A-1 *et. seq.* (1975) to the undisputed facts of this case, it is clear that the actions of Blazer, and his counsel, alleging infringement of the '421 Patent in the Home Depot Letter

34

and the Home Depot Suit were made in bad faith. Accordingly, summary judgment in DPCC's favor on the issue of liability with respect to Count II of its Consolidated Complaint is proper.

## VI.   CONCLUSION

For the reasons stated above, DPCC respectfully requests that the Court enter an order granting summary judgment as set forth herein and in DPCC's Motion for Partial Summary Judgment. (Doc. 160).

*S/C. Gregory Burgess*
C. Gregory Burgess (ASB-1519-R79C)
Jeremy A. Smith (ASB-1731-J73S)

**Attorneys for plaintiff Davis Product Creation and Consulting, LLC d/b/a BeesNThings**

**OF COUNSEL:**

**LANIER FORD SHAVER & PAYNE P.C.**
Post Office Box 2087 (35804)
2101 West Clinton Avenue, Suite 102
Huntsville, Alabama 35805
Telephone Number: (256) 535-1100
Facsimile Number: (256) 533-9322
Email: cgb@lanierford.com
        jas@lanierford.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of January 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

STEVEN M. BROM
**BACHUS, BROM & TAYLOR, LLC**
3125 Blue Lake Drive, Suite 101
Birmingham, Alabama 35243
Telephone: (205) 970-6747
Email: sbrom@bachusbrom.com

JOSEPH J. JACOBI
**HENSEN REYNOLDS LLC**
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Telephone: (312) 265-2252
Email: jjacobi@hansenreynolds.com

JEREMY ADELSON
**HANSEN REYNOLDS LLC**
301 North Broadway, Suite 400
Milwaukee, Wisconsin 53202
Telephone: (414) 455-7676
Email: jadelson@hansenreynolds.com

*S/C. Gregory Burgess*
C. Gregory Burgess

36