FILED
2023 Jan-31  PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| DAVIS PRODUCT CREATION AND CONSULTING, LLC, dba BEESNTHINGS, | ) ) ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-00848-CLM |
| | ) | |
| BRIAN BLAZER, dba CARPENTER BEE SOLUTIONS, | ) ) | Hon. Corey L. Maze |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF BRIAN BLAZER IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Steven M. Brom
Bachus, Brom & Taylor, LLC
3536 Independence Drive
Birmingham, Alabama 35209
Tel: (205) 970-6747
Fax: (205) 970-7776
sbrom@bachusbrom.com

*Counsel for Defendant Brian Blazer*
*d/b/a Carpenter Bee Solutions*

Of Counsel
Joseph J. Jacobi
Hansen Reynolds LLC
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: (312) 265-2252
jjacobi@hansenreynolds.com

Jeremy Adelson
Hansen Reynolds LLC
301 North Broadway, Suite 400
Milwaukee, Wisconsin 53202
Tel: (414) 455-7676
jadelson@hansenreynolds.com

# TABLE OF CONTENTS

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ............................. 1

**ARGUMENT** ................................................................................... 15

    A.  Legal Standard for Summary Judgment .................................... 15

    B.  Blazer is Entitled to Summary Judgment of Counts I and II
        of DPCC's Consolidated Complaint Because the Undisputed
        Facts and Evidence Establish That DPCC Has Never Had
        Absolute Intervening Rights to Sell of Offer for Sale All of
        its Side-Mounted Traps ............................................................ 16

        1.  The Record Evidence Does Not and Cannot Support
            DPCC's Claim for Tortious Interference With Business
            or Contractual Relations and Blazer is Entitled to Summary
            Judgment of Count I ............................................................ 21

        2.  Blazer's Assertion of Infringement by DPCC's Side-
            Mounted Traps was in Good Faith Because DPCC Had
            No Absolute Intervening Right—or Any Other Right—to
            Sell Those Traps and Blazer is Entitled to Summary
            Judgment of Count II ............................................................ 30

    C.  The Record Evidence and Undisputed Material Facts in this
        Case Establish Conclusively That None of Blazer's Accused
        Carpenter Bee Traps Infringe Any Claims of the '611 Patent
        and Blazer is Entitled to Judgment as a Matter of Law ............................. 33

    D.  DPCC's '426 and '384 Patents Are Invalid as Indefinite ........................ 40

        1.  The Single Claim of the '426 Patent Cannot Be Logically
            Construed and is Indefinite ................................................... 41

        2.  The Single Claim of the '384 Patent Cannot Be Logically
            Construed and is Indefinite ................................................... 43

    E.  DPCC's Accused Carpenter Bee Traps Infringe Blazer's
        '421 Patent ........................................................................... 44

    **CONCLUSION** ........................................................................ 47

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On July 27, 2004, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 6,766,611 ("the '611 patent") to Bruce Prince, whose estate subsequently assigned all right, title, and interest in the '611 patent to Clifford Davis Jr., who later assigned all right, title, and interest in the '611 patent to Plaintiff/Counterclaim Defendant Davis Product Creation and Consulting, LLC, d/b/a BeesNThings ("DPCC"). (Dkt. 159-4; *see also* Dkt. 115 ¶ 7; Dkt. 115-1.)

2.      On or before March 27, 2021, the term of the '611 patent expired and that patent is no longer in force. (Dkt. 117 ¶ 7.)

3.      On December 11, 2012, the USPTO issued U.S. Design Patent No. D672,426 ("the '426 patent") to its alleged inventor, Clifford Davis, Jr., who subsequently assigned all right, title, and interest in the '426 patent to DPCC. (Dkt. 159-5; *see also* Dkt. 115 ¶ 8; Dkt. 115-2.)

4.      On September 24, 2013, the USPTO issued U.S. Design Patent No. D690,384 ("the '384 patent") to its alleged inventor, Clifford Davis Jr., who subsequently assigned all right, title, and interest in the '384 patent to DPCC. (Dkt. 159-6; *see also* Dkt. 115 ¶ 9; Dkt. 115-3.)

5.      On June 6, 2017, the USPTO issued U.S. Patent No. RE46,421 ("the '421 patent"), entitled "Carpenter Bee Traps," to Defendant/Counterclaim Plaintiff Brian Robert Blazer ("Blazer") and his brother, Bradley Jerome Blazer. (Dkt.159-3;

*see also* Dkt. 115 ¶ 11; Dkt. 115-5.)

6.     Blazer's '421 patent is a reissue of U.S. Patent No. 8,375,624, which was previously issued on February 19, 2013, to Blazer and his brother, Bradley. (Dkt. 159-3 at 1.)

7.     DPCC is an Alabama limited liability company that has made, sold, offered for sale, had made for it, and/or imported into the United States various models of carpenter bee traps. (Dkt. 115 ¶ 2; *see also* Dkt. 45-1 ¶ 2.)

8.     DPCC has sold and offered for sale in the United States are certain traps having receptacles for catching and retaining carpenter bees attached to a side wall— i.e., a non-horizontal wall—of the wooden housing portion of the trap. These versions of DPCC's carpenter bee traps include models designated as "BEES-N-ST" (or "ST"), "BEES-N-AST" (or "AST"), and "BEES-N-BM" (or, "BM"). (Dkt. 46 ¶7; *see also* Dkt. 45-1 ¶¶ 3-4; Dkt. 115 ¶ 14.) DPCC's ST, AST, and BM carpenter bee traps are collectively referred to as "Side-Mounted Traps" for purposes of Blazer's Motion for Summary Judgment.

9.     After the '421 patent was issued by the USPTO to Blazer, Blazer conducted analyses of DPCC's Side-Mounted Traps, including comparing those traps to the claims of the '421 patent, and upon concluding that DPCC's Side-Mounted Traps infringed claims of that patent, Blazer submitted notices—including notices dated February 16, 2018, and August 8, 2018—to Amazon.com, in

accordance with its policies and procedures, identifying infringing DPCC Side-Mounted Traps listed for sale on Amazon.com. (Dkt. 115 ¶ 14; Dkt. 159-11 at 12-14; Dkt. 159-11 at 15-17.)

10.    On February 21, 2018, Amazon.com issued a notice to DPCC of Blazer's report of infringement on February 16, 2018. (Dkt. 115 ¶ 14; Dkt. 115-8.)

11.    In response to the February 21, 2018, notice from Amazon.com, DPCC's counsel sent a letter dated March 2, 2018 ("the March 2 Letter"), to counsel for Blazer informing Blazer of DPCC's opinion that it had absolute intervening rights pursuant to 35 U.S.C. § 252 to sell or offer for sale its entire remaining inventory of Side-Mounted Traps. (Dkt. 115 ¶ 15; Dkt. 115-9 at 1.)

12.    According to DPCC, it had absolute intervening rights as to its entire inventory of Side-Mounted Traps because all of "those bee traps were ordered, manufactured, paid for and received before the June 6, 2017 issue date" of Blazer's reissued '421 patent. (Dkt. 115-9 at 2.)

13.    In putative support of this opinion, DPCC attached to the March 2 Letter documents that it represented "relat[ed] to bee traps with a side mounted receptacle ordered, manufactured, paid for and received by DPCC well before the June 6, 2017 issue date" of the '421 patent. (*Id.* at 3.)

14.    Specifically, DPCC represented that these documents included "sales contract[s], a commercial invoice[s] and a packing list[s] from DPCC's

manufacturer" and shipping invoices from its shipping company for: (1) "bee traps with a side mounted receptacle ordered, manufactured, paid for and received by DPCC in 2015" and (2) "bee trap models BEES-N-ST and BEES-N-AST ordered, manufactured, paid for and received by DPCC in 2016." (Dkt. 115-9 at 3-15.)

15.    According to DPCC, these documents "establish that DPCC ordered, had manufactured, paid for an received a total of 89,610 bee traps in 2015" and "182,272 bee traps in 2016, all of which are sold with side mounted receptacles." (*Id.* at 3-4.)

16.    DPCC's characterization of the documents it attached to its March 2 Letter was not correct. First, these documents reflected only that DPCC ordered and received wooden housings from its Chinese supplier. These wooden housings are parts used in the manufacture of its Side-Mounted Traps. They are not completely manufactured Side-Mounted Traps, as DPCC represented. (*Id.* at 5-15.)

17.    Second, none of the documents provided by DPCC with its March 2 Letter demonstrated that DPCC had ordered and received before June 6, 2017, any of the other parts used for the manufacture of DPCC's Side-Mounted Traps, including, for example, receptacles and receptacle lids. (*Id.*)

18.    Third, the documents attached to DPCC's March 2, Letter did not establish—or even suggest—that DPCC had manufactured its entire remaining inventory before June 6, 2017, incorporating the wooden housings purportedly

ordered and received from its Chinese supplier in 2015 and 2016. (*Id.*)

19.    Fourth, the documents attached to DPCC's March 2 Letter reflected only that DPCC purportedly ordered and received 162,272 wooden housings for use in manufacture of its ST and AST Side-Mounted Traps, and *not* "a total of 182,272 bee traps," as DPCC misrepresented. (*Id.* at 4 and 11-15.)

20.    Finally, DPCC's documents provided with its March 2 Letter did not reflect that DPCC had actually paid for any of the wooden housings it ordered and received from its Chinese supplier. Those documents reflected only that DPCC had been invoiced for those parts. (*Id.* at 5-15.)

21.    Based upon DPCC's unsupported statement in the March 2 Letter that its entire inventory of Side-Mounted Traps had been manufactured, paid for, and received before June 6, 2017, and its unsupported opinion that it had absolute intervening rights pursuant to 35 U.S.C. § 252 to sell or offer for sale all of its Side-Mounted Traps, DPCC demanded that Blazer notify Amazon.com that he no longer believes those traps infringed his '421 patent and that his previous notice of infringement was withdrawn. (*Id.* at 4.)

22.    DPCC also demanded that Blazer "cease and desist from communicating with any third parties concerning DPCC's side mounted traps and/or claiming that DPCC's bee traps with a side mounted receptacle infringe" the '421 patent, and stated that, if he continued to claim that Side-Mounted Traps infringed

5

his patent, DPCC would "be forced to protect its rights and business interests." (*Id.*)

23.     Because DPCC's March 2 Letter failed to provide any support for its claim to absolute intervening rights to sell or offer for sale its Side-Mounted Traps, and because DPCC continued to sell and offer for sale those traps, Blazer continued to assert that those Side-Mounted Traps infringed his '421 patent, communicating his position to Amazon.com and other sellers and distributors of DPCC's Side-Mounted Traps. (Dkt. 159-9 at 95-116; Dkt. 159-11 at 15-18, 35-36, 74-77.)

24.     On April 13, 2020, DPCC filed its "Motion for Partial Summary Judgment by Plaintiff Davis Product Creation and Consulting, LLC d/b/a BeesNThings" ("Partial Summary Judgment Motion"). (Dkt. 44.) In that motion, DPCC sought judgment in its favor as to Count VI of its Corrected Second Amended Complaint, in which DPCC requested declaratory judgment that it had absolute intervening rights to sell or offer for sale its remaining inventory of Side-Mounted Traps. (Dkt. 44 at 2.) DPCC further sought judgment in its favor as to Count VII of Blazer's counterclaim, in which Blazer asserted claims of infringement by DPCC's Side-Mounted Traps. (*Id.*)

25.     In support of its Partial Summary Judgment Motion, DPCC filed a Declaration of Clifford Davis Jr., who is DPCC's managing member. (Dkt. 45-1, ¶ 1.) In this declaration, Mr. Davis declared under penalty of perjury that, beginning in 2015 and continuing thereafter, "DPCC sold, offered for sale, or imported

6

carpenter bee traps with a side mounted receptacle," including DPCC's "models BEES-N-AST, BEES-N-BM and BEES-N-ST" carpenter bee traps. (*Id.*, ¶ 3.)

26.    Mr. Davis further declared that "DPCC ordered, had manufactured, paid for and received 89,610 of these bee traps in 2015," and that "DPCC ordered, had manufactured, paid for and received a total of 182,272 model BEES-N-ST and BEES-N-AST bee traps in 2016." (*Id.*, ¶¶ 3-4.)

27.    Mr. Davis stated that he attached as Tabs 1 and 2 to his declaration "[a] true and correct copy of a sales contract, commercial invoice and packing list from DPCC's manufacturer, and a shipping invoice demonstrating these 2015 sales," as well as "[a] true and correct copy of a sales contract, commercial invoice and packing list from DPCC's manufacturer, and shipping invoice demonstrating these 2016 sales."[1] (*Id.*, ¶¶ 3-4 and pp. 4-16.)

28.    Contrary to Mr. Davis' declaration, the attached documents show only that DPCC ordered, had manufactured, and received component parts that DPCC could have used in the manufacture of Side-Mounted Traps. The products reflected in those documents are only wooden housings or boxes and are *not* complete, fully manufactured carpenter bee traps. (*Id.* at 4-16.)

29.    DPCC also filed with the Court on April 13, 2020, its brief in support

---

[1] Tab 2 to the Declaration of Clifford Davis Jr. includes only sales contracts and a commercial invoice for the transaction in 2016. It does not include a packing list or shipping invoice, notwithstanding Mr. Davis' declaration to the contrary.

of its Partial Summary Judgment Motion. (Dkt. 46.) In that brief, DPCC represented as statements of undisputed facts each of the following:

    a. "[I]n 2015, DPCC sold bee traps with a side-mounted receptacle, including models BEES-N-AST, BEES-N-BM and BEES-N-ST." (*Id.* ¶ 7.)

    b. "In 2015 DPCC ordered, had manufactured, paid for, and received 89,610 side-mounted bee traps." (*Id.* ¶ 8.)

    c. "In 2016, DPCC ordered, had manufactured, paid for, and received a total of 182,272 model BEES-N-ST and BEES-N-AST bee traps in 2016 [*sic*]." (*Id.* ¶ 9.)

    d. "DPCC's entire inventory of side-mounted carpenter bee traps was purchased, in existence, and imported prior to the June 6, 2017 date the '421 Patent was reissued." (*Id.* ¶ 10.)

30.    In support of each of these supposed undisputed facts, DPCC cited to and relied upon paragraphs 3 and 4 of the Declaration of Clifford Davis Jr., and the documents attached to that declaration as Tabs 1 and 2. (*Id.* at 4-5, citing Dkt. 45-1, ¶¶ 3-4 and pp. 4-16.)

31.    DPCC has always advertised and marketed its Side-Mounted Traps—i.e., its models BEES-N-ST, BEES-N-AST, and BEES-N-BM carpenter bee traps—as being "[a]ssembled in the U.S.A" or being "[a]ssembled in the U.S.A. by people with disabilities." (Dkt. No. 159-21; Dkt. 159-22; Dkt 159-23; Dkt. 159-24.) This is

in direct contrast to other styles of carpenter bee traps actually manufactured in China that DPCC advertised and marketed as "[l]abeled, packaged, and distributed in the U.S.A." (Dkt. 159-25.)

32.    The Court entered its Partial Consent Judgment Order on February 8, 2021, incorporating Blazer's stipulation "that DPCC is entitled to sell or offer for sale its remaining inventory of side-mounted traps but only to the extent that side-mounted traps were purchased or manufactured by DPCC prior to June 6, 2017" and the parties' stipulation that "the court should grant summary judgment for DPCC on Count VII [of Blazer's counterclaim] for all side-mounted traps bought or manufactured by DPCC before June 6, 2017." (Dkt. 71 at 2.)

33.    The Court granted DPCC's Partial Summary Judgment motion as to Count VI of DPCC's complaint and Count VII of Blazer's counterclaims, but expressly limited that judgment "only to the use and sale of side-mounted trap acquired before June 6, 2017—the reissue date of the '421 Patent." (*Id.*)

34.    On March 2, 2022, counsel for Blazer inspected DPCC's storage facility in Prattville, Alabama ("DPCC Storage Facility"). (Dkt. 159-1, ¶ 1.)

35.    During this inspection, which was also attended by Clifford Davis Jr. and counsel for DPCC, Blazer's counsel observed that the majority of the inventory held by DPCC at the DPCC Storage Facility was only parts for use in manufacture of Side-Mounted Traps, and *not* fully and finally manufactured carpenter bee traps

ready for sale. (*Id.* ¶¶ 2-4, 7, 13, 17-18, and 20-21.)

36.     Mr. Davis provided a tour of the DPCC Storage Facility, during which he showed Blazer's counsel what was stored there and stated that the inventory present during the inspection on March 2, 2022, had been stored and maintained there since at least 2016. (*Id.* ¶ 7.)

37.     Blazer's counsel observed that DPCC stored wooden housings for each model of its Side-Mounted Traps, as well as different versions of receptacle lids, receptacles, and screws. (*Id.* ¶¶ 13 and 15.)

38.     Mr. Davis explained that these parts were used by DPCC to assemble its Side-Mounted Traps, by attaching a receptacle lid to a wooden housing using panhead screws, and then attaching a receptacle to the lid. (*Id.* ¶¶ 8-11.) During assembly, the hole in the receptacle lid must be aligned with the exit hole in the wooden housing to ensure that bees leaving the housing through the exit hole can enter an attached receptacle to be trapped in the receptacle. (*Id.* ¶ 9.)

39.     Mr. Davis further explained that DPCC generally assembled its Side-Mounted Traps from the parts maintained at the DPCC Storage Facility after it received orders for those traps from customers and distributors. (*Id.* ¶ 12.)

40.     Blazer's counsel observed a makeshift table in the DPCC Storage Facility that appeared to be a workstation at which DPCC manufactured its Side-Mounted Traps from the parts stored at the facility—i.e., wooden housings,

receptacle lids, receptacles, and screws—which was consistent with Mr. Davis' explanation of DPCC assembles its Side-Mounted Traps. (*Id.* ¶ 16.)

41.    After the inspection of the DPCC Storage Facility on March 2, 2022, Blazer propounded written discovery requests of DPCC directed, in part, to discover information about when DPCC's Side-Mounted Traps were actually manufactured and in existence. DPCC initially objected to these requests but eventually served Objections and Amended Answers by Plaintiff Davis Product Creation and Consulting, LLC to Second Interrogatories of Defendant ("DPCC's Answers to Second Set of Interrogatories") on June 24, 2022, and Objections and Responses by Plaintiff Davis Product Creation and Consulting, LLC to Second Request for Production of Defendant ("DPCC's Responses to Second Requests for Production") on June 23, 2022. (Dkt. 159-19 and 159-20.) Clifford Davis Jr. swore that DPCC's Answers to Second Set of Interrogatories were "true and correct to the best of his present knowledge, information, and belief." (Dkt. 159-20 at 21.)

42.    Blazer asked DPCC to identify all factual and legal bases for its contention that it was entitled to sell or offer for sale its Side-Mounted Traps, as well as identification of all evidence on which DPCC would rely to show that (1) all Side-Mounted Traps were acquired by DPCC prior to June 6, 2017, and (2) all Side-Mounted Traps were assembled by DPCC and were final, finished traps ready for sale before June 6, 2017. For its answer to this interrogatory, DPCC relied on its

Partial Summary Judgment Motion and the supporting materials filed with the Court on April 13, 2020—i.e., the Declaration of Clifford Davis Jr. and DPCC's brief in support of that motion. DPCC further stated that all of its Side-Mounted Traps were "ordered, manufactured, paid for and received" in 2015 and 2016 and that it would rely on "documents within the evidentiary submission previously filed with the Court on April 13, 2020," its March 2 Letter and attachments, "as well as the testimony of a representative of DPCC which will establish that all traps were final by June 6, 2017." (Dkt. 159-20 at 5-6 (Interrogatory No. 10.) DPCC's answer did not elaborate as to the expected testimony of DPCC's representative or how that testimony would reconcile with the reality that, as recently as March 2, 2022, DPCC still had not made all of its Side-Mounted Traps or that its managing member (and previous Rule 30(b)(6) designee) had stated on March 2, 2022, that DPCC made its Side-Mounted Traps from the parts in inventory at DPCC's Storage Facility following orders by customers or distributors. (Dkt. 159-1 ¶ 12.)

43.     Blazer also propounded an interrogatory to DPCC asking for a detailed description of DPCC's process for manufacturing its carpenter bee traps—including its Side-Mounted Traps—from parts, including among other details the time, relative to receipt of parts, that DPCC assembles its traps. For its answer to this interrogatory, DPCC stated that "[f]rom late 2015 until present, all bee traps are completely assembled in China and then distributed from a facility in North Carolina. DPCC

stored side mounted side mounted traps in Prattville, Alabama and has stored other models of traps in North Carolina." (Dkt. 159-20 at 11-13 (Interrogatory No. 15).)

44.    DPCC inexplicably took this position and swore it to be true despite knowing that, as recently as March 2, 2022, it was storing parts for its Side-Mounted Traps at DPCC's Storage Facility, and it had not manufactured traps from those parts as of that date. Consequently, it is not possible that all of DPCC's bee traps— including its Side-Mounted Traps—from late 2015 to the present were completely assembled in China. (Dkt. 159-1 ¶¶ 2, 7, and 12-13.)

45.    Blazer testified that he applied a proprietary blend of substances known to attract carpenter bees—i.e., bait according to this Court's construction—to every single carpenter bee trap he ever made, used, sold, or offered for sale. (Dkt. 159-7 (Dep. Tr. 94:1-95:16, 96:2-97:15, 99:2-105:14, and 123:6-130:12).)

46.    DPCC's own expert witness, Dr. George Rotramel, agreed the substances incorporated into Blazer's bait are attractants for carpenter bees. (Dkt. 159-14 (Dep. Tr. 13:22-132:14).)

47.    Viewing photographs of DPCC's traps accused of infringing the '421 patent, DPCC's own expert witness, Dr. George Rotramel, testified that the DPCC's AST, BM, Natural Bee, and Bottom Receptacle traps include each and every limitation of Claims 13-15 and 17—meaning those traps infringe Claims 13-15 and 17 of the '421 patent, and that DPCC's AST, BM, and Bottom Receptacle traps also

include the features claimed by Claims 16 and 20, thereby also infringing those claims. (Dkt. 159-14 (Dep. Tr. 147:16-160:18.)

48.     Pursuant to the Court's Amended Scheduling Order (Dkt. 152), DPCC's expert, Dr. Rotramel, issued a supplemental report on January 13, 2023. (Dkt. 159-27 at 5-10.) Dr. Rotramel testified at his subsequent deposition on January 27, 2023, that this supplemental expert report superseded and replaced his previous expert report. (Dkt. 159-26 at 5-6 and 14 (Dep. Rough Tr. 14:9-17:5; 52:5-10).)

49.     Except for his opinions regarding the infringement and validity of claims of the '421 patent, Dr. Rotramel's opinions and his amended report was unchanged and was identical to his original report. (Dkt. 159-26 at 13-14 (Dep. Rough Tr. 45:7-52:10); Dkt. 159-27 at 5-10.)

50.     Regarding his opinions of infringement of the '421 patent claims by DPCC's traps, Dr. Rotramel testified that he only expressed an opinion of non-infringement with respect to DPCC's Natural Bee Trap and did not have an opinion of non-infringement regarding any of DPCC's other traps. (Dkt. 159:26 at 13-14, 18, 20, 22, and 23 (Dep. Rough Tr. 48:16-52:10; 67:12-68:22; 73:17-74:1 81:22-82:8; 88:16-21).)

51.     Dr. Rotramel further testified at his deposition that certain DPCC carpenter bee traps—specifically, DPCC's ST, AST, BM, Bottom Receptacle, and Natural Bee traps—include structure that meet each and every limitations of at least

claims 13, 14, 15, 16, and 17 of the '421 patent, thereby confirming his previous sworn deposition testimony that each of those DPCC carpenter bee traps include structure that meets each and every limitation of at least claims 13-17 of the '421 patent. (Dkt. 159-26 at 18-23 (Dep. Rough Tr. at 67:12-88:21); 159-27 at 47-52; 159-28 at 2-27.) That is, Dr. Rotramel testified that each of the accused DPCC carpenter bee traps infringe at least those claims of the '421 patent.

## ARGUMENT

### A.   Legal Standard for Summary Judgment.

Federal Rule of Civil Procedure ("Rule") 56 states that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shine v. Bd. of Trustees of Univ. of Alabama*, 2021 WL 6198064 at *3 (N.D. Ala. Dec. 30, 2021); *Gifford v. Rathman*, 2017 WL 4340454 at *1 (N.D. Ala. Sept. 29, 2017). A party opposing summary judgment cannot simply rest on allegations or denials in its pleadings, or hypothetical scenarios to question a movant's entitlement to summary judgment. "To survive a 'properly supported motion for summary judgment, [the nonmovant] must come forward with specific factual evidence, presenting more than mere allegations.'" *Shine*, 2021 WL 6198064 at *3 (quoting *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

While a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" conclusory allegations and speculation do not create genuine issues of material fact sufficient to defeat a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)); *see also Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995)).

When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574, 587 (1986) (citations omitted)). In particular, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not accept that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. *Accord Glasscox*, 903 F.3d at 1213.

**B.    Blazer is Entitled to Summary Judgment of Counts I and II of DPCC's Consolidated Complaint Because the Undisputed Facts and Evidence Establish That DPCC Has Never Had Absolute Intervening Rights to Sell or Offer to Sell All of its Side-Mounted Traps.**

DPCC's causes of action asserted in Counts I and II of its Consolidated

Complaint for tortious interference with business or contractual relations and for bad faith claims of patent infringement, respectively, are premised on allegations that DPCC had absolute intervening rights under 35 U.S.C. § 252 to sell or offer to sell its Side-Mounted Traps, that Blazer knew that DPCC had such rights, and that, despite this knowledge, Blazer continued to claim that those Side-Mounted Traps infringed his reissued '421 patent.

DPCC has never, however, provided evidence establishing that it is entitled to absolute intervening rights pursuant to 35 U.S.C. § 252 to sell or offer for sale its Side-Mounted Traps. The only evidence in the record on this matter are various sales contracts and shipping records included with DPCC's March 2, 2018 letter to Blazer's former counsel ("March 2 Letter"), copies of which have been filed in support of each version of DPCC's complaint in this case, and its Partial Summary Judgment Motion. (Dkt. 115-9 at 5-15.) These documents do not evidence that DPCC acquired complete carpenter "bee traps" prior to June 6, 2017—the date of reissue of the '421 patent—as misrepresented by DPCC. (Dkt. 115-9 at 3-4.) Rather, at most, these documents purportedly show that DPCC ordered wooden housings (trap entrance units) *to make* carpenter bee traps.

There is no dispute regarding the law on the doctrine of absolute intervening rights. In pertinent part, 35 U.S.C. § 252 states:

> A reissued patent shall not abridge or affect the right of any person or
> that person's successors in business **who, prior to the grant of a**

> **reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States**, **anything patented by the reissued patent**, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.

35 U.S.C. § 252 (emphasis added). As quoted in DPCC's brief in support of its motion for partial summary judgment, the legislative history of § 252 underscores this critical point: "The *specific things **made before the date of reissue**, which infringe the new reissue claims*, are absolutely free of the reissued patent and may be used or sold after the date of reissue without regard to the patent." (Dkt. No. 46 at 11 (citing *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1221 (Fed. Cir. 1993) (bold emphasis added by DPCC, italicized emphasis added) (additional citation omitted).

The important point here is that absolute rights only extend to the "specific thing" that "infringe[s] the new reissue claim" if made or acquired prior to the reissue date. 1 F.3d at 1221. Thus, to demonstrate that any of its inventory of Side-Mounted Traps were entitled to the benefit of absolute intervening rights, DPCC needed to show that it possessed the "specific thing"—i.e., that it acquired complete Side-Mounted Traps covered by Blazer's reissue claims before their issuance, a showing DPCC has never made.

The only documentary evidence DPCC has provided purports to show that DPCC purchased *wooden housings* in 2015 and 2016 from which carpenter bee traps *could have been made*. (Dkt. No. 115-9 at 5-6 & 11 (images from same reproduced below)). As shown below, there is no confusing these wooden housings with DPCC's completed bee traps. Side-Mounted Traps include a "receptacle adapter located at the exit opening of the trap entrance unit . . . adapted to receive at least one receptacle" and "a receptacle removably attached to the receptacle adapter"—and infringe at least reissue claim 14 of the '421 patent—whereas the wooden housings do not. (*Compare* Dkt. 115 at 6 *with* Dkt. 115-5, Claim 14).



**Wooden housings shown in documents with DPCC's March 2 Letter on left; DPCC's AST, BM, and ST Side-Mounted Traps from top to bottom on right**.

The wooden housings shown in DPCC's March 2 letter, which lack receptacle adapters and receptacles, are not a "bee traps." DPCC's representation to the contrary is disingenuous. Moreover, upon inspection of DPCC's storage facility on March 2, 2022 and discovery of tens of thousands of wooden housings, Blazer was first able to confirm that DPCC ordered wooden housings—not complete bee traps—even though DPCC has repeatedly characterized its storage facility inventory as "Side Mounted Traps." (Dkt. 159-1 ¶17; *see also* Dkt. 115 at 7 n.2).

As the above, incontrovertible application of 35 U.S.C. § 252 demonstrates, DPCC did not and still has not demonstrated that it possessed completed Side-Mounted Traps prior to the issuance of his '421 patent, and thus, that it had the absolute intervening rights it claimed in *any* Side Mounted Trap. Moreover, the fact that DPCC still has tens of thousands of wooden housings, lids, and receptacle from which it could have manufactured Side-Mounted Traps calls into question whether DPCC ever manufactured complete Side Mounted Traps, let alone its "entire inventory" of such traps prior to June 6, 2017 as represented to the Court. (Dkt. 159-1 ¶ 17; Dkt. No. 46 at 12). DPCC's failure to produce any evidence that it possessed complete Side-Mounted Traps prior to June 6, 2017, is fatal to its claims under Counts I and II. That it still has parts *to make* tens of thousands of Side-Mounted Traps demonstrates that DPCC has made numerous misrepresentations to the Court and to Blazer, and never had a good faith basis to bring those claims.

### 1.  The Record Evidence Does Not and Cannot Support DPCC's Claim for Tortious Interference With Business or Contractual Relations and Blazer is Entitled to Summary Judgment of Count I.

In Count I of its Consolidated Complaint, DPCC alleges that "Blazer intentionally interfered with DPCC's business or contractual relationship with Amazon.com by refusing to acknowledge DPCC's absolute intervening rights and the right to sell or offer for sale the Side-Mounted Traps on Amazon.com." (Dkt. 115 ¶ 39.) DPCC further asserts that Blazer "attempted to interfere with DPCC's business and contractual relations with Home Depot and other customers," and that DPCC has suffered and continues to suffer damage as a consequence of Blazer's alleged acts. (*Id.* ¶¶ 39-40.) As alleged by DPCC, this conduct by Blazer constitutes tortious interference with business and/or contractual relations under Alabama law.

To make out a *prima facie* claim for tortious interference with business or contractual relations, DPCC must present evidence of each of the following elements: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damages." *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So.3d 5, 14 (Ala. 2009). Blazer does not agree that DPCC can prove these elements according to the record evidence in this case, but for purposes of his motion for summary judgment assumes that DPCC can make out a *prima facie* claim for tortious interference.

However, there is no tort under Alabama law for *attempted* tortious interference. DPCC has not alleged or provided evidence in this case that Blazer succeeded in his supposed "attempt[ ] to interfere with DPCC's business and contractual relations with Home Depot and other customers." (Dkt. 115 ¶ 39.) Indeed, unless Blazer had succeeded in those alleged attempts, thereby elevating them from mere attempts (which is all that DPCC has asserted in its Consolidated Complaint) to tortious interference, DPCC necessarily could *not* establish all of the elements for tortious interference with regard to its alleged relationships "with Home Depot and other customers." At a minimum, for mere attempts, DPCC cannot present evidence that Blazer successfully intentionally interfered with DPCC's relationships with Home Depot and other unidentified customers, or that DPCC suffered damages as a result of Blazer's alleged failed attempts.

Consequently, DPCC's claim for relief in Count I of the Consolidated Complaint for Blazer's alleged tortious interference is limited to Blazer's alleged intentional interference "with DPCC's business or contractual relationship with Amazon.com by refusing to acknowledge DPCC's absolute intervening rights and the right to sell or offer to sell the Side Mounted Traps on Amazon.com." (*Id.* ¶ 39.) The relevant alleged conduct of Blazer about which DPCC complains as bases for its claim for tortious interference with its Amazon.com relationship is: "(i) the failure to instruct Amazon.com to 're-list' the Side Mounted Traps after the March 2, 2018

letter informing Blazer and his agents of DPCC's absolute intervening rights." (*Id.* ¶ 37.) In essence, DPCC's claim in Count I, is premised entirely on its assertion that it has absolute intervening rights to sell or offer for sale its Side-Mounted Traps and that Blazer tortiously interfered in DPCC's relationship with Amazon.com by "refusing to acknowledge" that DPCC's claim to being allowed to sell and to offer for sale its Side-Mounted Traps on Amazon.com pursuant to those supposed absolute intervening rights. (*Id.* ¶ 39; *see also id.* ¶ 37 (alleging in support of Count I that Blazer was obligated but failed to "instruct Amazon.com to 're-list' the Side Mounted Traps" after being notified by DPCC's counsel of his opinion that DPCC had absolute intervening rights to sell or offer for sale its Side-Mounted Traps); *id.* ¶ 36 (alleging in support of Count I that "Blazer and/or his agents have continued to make bad faith allegations of infringement concerning DPCC's Side Mounted Traps despite being informed of" DPCC's counsel's opinion that DPCC had absolute intervening rights as to its Side-Mounted Traps).

Justification is an affirmative defense to claims for tortious interference with business or contractual relations. *See, e.g.*, *White Sands*, 32 So.3d at 12; *Parsons v. Aaron*, 849 So.2d 932, 946 (Ala. 2002); *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So.2d 203, 212 n.5 (Ala. 2001). "Whether a defendant's interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the

surrounding circumstances." *White Sands*, 32 So.3d at 12 (quoting *Gross v. Lowder Realty Better Homes and Gardens*, 494 So.2d 590, 597 n.3 (Ala. 1986)).

To analyze this balance, Alabama courts have adopted the factors set forth in the Restatement (Second) of Torts § 767 (1979), which describes "Factors in Determining Whether Interference is Improper." *See, e.g.*, *Cobbs, Allen & Hall, Inc. v. EPIC Holdings, Inc.*, 335 So.3d 1115, 1131-32 (Ala. 2021) (quoting *Gross*, 494 So.2d at 597 n.3); *Daily v. The Rawlings Co., LLC*, 2016 WL 192071 at *13 (N.D. Ala. Jan. 15, 2016) (quoting *Gross*, 494 So.2d at 597 n.3). Courts may consider the following factors: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Id.*

In the present case, Blazer's conduct could hardly be more justified. As the owner of the '421 patent, Blazer has a statutory right to enforce that patent against infringers. The Patent Act, Title 35 of the U.S. Code, enacted in furtherance of Article 1, Section 8(8) of the U.S. Constitution, provides for that right. In contrast, DPCC has no right to sell or offer for sale any product that infringes a presumptively valid and enforceable U.S. patent, such as Blazer's '421 patent.

The undisputed facts of this case analyzed under the factors considered by Alabama courts to decide whether alleged interference was justified compels the same conclusion; the balance of these factors weighs heavily in Blazer's favor. Of the seven factors (a-g), all but the sixth factor, factor (f) "proximity [of Blazer's] conduct to the interference," weighs in Blazer's favor. The balance of factors, therefore, establishes that any interference by Blazer was in good faith and justified.

The first factor inquires as to the specific nature of the conduct by the alleged interfering actor. The conduct of Blazer of which DPCC complains is his communication to Amazon.com that DPCC's Side-Mounted Traps infringed claims of his '421 patent. After the '421 patent issued, Blazer investigated DPCC's Side-Mounted Traps and formed a good faith and reasonable belief that those traps infringed claims of that patent. Blazer prepared claim charts demonstrating this infringement and, pursuant to Amazon's policies and procedures, notified it of his position, providing his claims charts demonstrating infringement of the '421 patent by DPCC's Side-Mounted Traps. (Dkt. 159-11 at 12-17.)

In response, DPCC contacted Blazer demanding that he withdraw his notice of infringement to Amazon.com. DPCC did not assert that its Side-Mounted Traps did not infringe the '421 patent or that the claims of that patent covering those traps were invalid. Instead, DPCC relied solely upon its opinion that it had absolute intervening rights to sell or offer for sale its Side-Mounted Traps. (Dkt. 115 ¶ 15;

Dkt. 115-9.) In contrast to Blazer's notice to Amazon.com, which included claim charts comparing the accused Side-Mounted Traps to claims of the '421 patent, DPCC provided no evidence to support its assertion that it was entitled to absolute intervening rights as to those traps. As discussed above, DPCC conflated wooden housings with "bee traps," contending that evidence of its receipt of wooden housings established that DPCC ordered and received "bee traps," before the date of reissue of the '421 patent on June 6, 2017. (Dkt. 115-9 at 3-4.) Because wooden housings are not "bee traps," there has never been any merit to DPCC's claim in its March 2 Letter. Presumably, if DPCC had documentation demonstrating its claim that its "entire inventory of side-mounted traps . . . were ordered and in existence before June 6, 2017" it would have provided that documentation by now. [2] (*See* Dkt. 46 at 14; *see also, BIC Leisure Prods.*, 1 F.3d at 1221 (holding that absolute intervening rights only apply to the "specific thing" claimed in a reissue claim.) Because DPCC has never provided that documentation, and in view of the tens of thousands of wooden housings, lids, and jars to make Side-Mounted Traps in its possession, Blazer has at all times acted in good faith to assert his '421 patent.

---

[2] Despite Blazer having issued discovery requests in this case for documents and information about when the other parts used in the manufacture of DPCC's Side-Mounted Traps were received, DPCC produced no such documents and information. The record, therefore is silent as to whether DPCC even had the lids, receptacles, and screws necessary to make its Side-Mounted Traps before June 6, 2017, let alone whether it actually manufactured its Side-Mounted Traps before that date.

Because DPCC did not and does not have absolute intervening rights pursuant to 35 U.S.C. § 252 to sell or offer its Side-Mounted Traps, and because the reissued '421 patent includes claims that cover those traps, Blazer's assertion of infringement was reasonable and in good faith, and his communications with Amazon.com regarding that infringement and requesting removal of DPCC's infringing Side-Mounted Traps was justified. (Dkt. 159-14 (Dep. Tr. 147:16-160:18); Dkt. 159-11 at 12-17; Dkt. 159-18.)

The second factor, the actor's motive, likewise weighs in Blazer's favor. Blazer's motivation in notifying Amazon.com of his infringement claim against DPCC's Side-Mounted Traps was to protect and enforce his rights in the '421 patent, and the rights of his licensees under that patent. In this regard, there was nothing improper about Blazer's motives underlying his conduct. Blazer has an undeniable right under the Patent Act to enforce his patent, and because DPCC's infringement was unauthorized and not protected by any right, Blazer's motive was proper.

The third considers the interests of the other with which the actor's conduct interferes and also weighs in favor of Blazer. Some interests pursuant to business or contractual relations are more important and protectible than others. *Daily*, 2016 WL 192071 at *15. As discussed above, DPCC's interest in the unauthorized sale of products that infringe Blazer's '421 patent is not protectible. DPCC had no absolute intervening rights—or any other rights—under which it was allowed to sell or offer

for sale its Side-Mounted Traps that Blazer had a good faith and reasonable belief infringed claims of his '421 patent. Accordingly, this factor weighs in Blazer's favor.

The fourth factor, the interests sought to be advanced by the actor, likewise weighs in Blazer's favor. Blazer's conduct was authorized under the Patent Act and was undertaken as an appropriate means of protecting his valuable intellectual property rights. In addition, Blazer's actions were intended to protect the rights of his licensees, which he was contractually obligated to do, and which provided him economic benefits. Such economic benefits are "important and will normally prevail over a similar interest of the other if the actor does not use wrongful means." *Id.* (quoting Restatement (Second) of Torts § 767, cmt. f).

The fifth factor takes into account the social interest in protecting the freedom of action of the actor as compared to the contractual interests of the other. This factor weighs heavily in Blazer's favor. There is a clear and strong social interest— reflected in the Constitution and the Patent Act—favoring the advancement of sciences and the useful arts by protection of intellectual property rights. In contrast, there is no social interest or benefit in protecting the ability of a person to sell products accused, reasonably and in good faith, of infringing a presumptively valid and enforceable patent.

The sixth factor looks into the proximity or remoteness of the actor's conduct to the interference, which arguably favors DPCC. Blazer's submission to

Amazon.com of a notice of infringement of his '421 patent by DPCC's Side-Mounted Traps was presumably the immediate cause of Amazon.com's decision to take down listings for those accused products from its site.

The seventh factor considers the nature of the relationship between the parties, and again favors Blazer. By the time of Blazer's notification to Amazon.com of infringement by the Side-Mounted Traps in 2017 and 2018, the parties were no longer competitors in the market for carpenter bee traps. Blazer had discontinued making and selling carpenter bee traps in 2016. Consequently, Blazer was acting only as the owner of the '421 patent to protect and enforce his valuable intellectual property rights and to meet his obligation to protect the rights of his licensees by enforcing his '421 patent. Accordingly, this factor weighs in favor of Blazer.

Applying the factors applied by Alabama courts in circumstances such as these to the undisputed facts of this case further confirms that Blazer's conduct was justified and that DPCC's claim in Count I of its Consolidated Complaint for tortious interference with business or contractual relations fails as a matter of law. Blazer's statutorily sanctioned right to protect and enforce his '421 patent justifies his assertion of infringement, made in good faith, supported by analyses, and documented by claim charts comparing the DPCC Side-Mounted Traps to the claims of Blazer's patent. A patent holder has the right under the Patent Act to exclude infringers from making, using, selling, and offering to sell his patented inventions,

and this right trumps whatever business relation DPCC sought to maintain with Amazon.com. DPCC had no absolute intervening right to sell or offer to sell its Side-Mounted Traps, nor did it have any other protectible right to infringe Blazer's patent. Blazer respectfully requests that this Court enter summary judgment in his favor as to Count I of DPCC's complaint.

> **2.    Blazer's Assertion of Infringement by DPCC's Side-Mounted Traps was in Good Faith Because DPCC Had No Absolute Intervening Right—or Any Other Right—to Sell Those Traps and Blazer is Entitled to Summary Judgment of Count II.**

Blazer is further entitled to summary judgment of Count II of DPCC's Consolidated Complaint seeking relief for the alleged violation of Alabama Code §§ 8-12A-1, *et seq.* Section 8-12A-1 of the Alabama Code proscribes the assertion of claims of patent infringement in bad faith and authorize the target of such assertions to bring a cause of action "in the circuit court of the county in which the defendant resides." Ala. Code § 8-12A-2. The statute defines certain factors that courts *may* consider "as evidence that a person has made an assertion of patent infringement in bad faith."

These factors include considering whether the content of any demand letter included the patent number, the name and address of the patentee, and "[f]actual allegations concerning the specific areas in which the target's products, services, and technology infringe the patent or are covered by the claims in the patent," and whether the patentee refused to provide this information if the target requested it.

Ala. Code §§ 8-12A-2(e)(1) and (3). Courts may also consider whether the person asserting infringement conducted an analysis comparing the accused products to the claims of the patent, and whether the claim of infringement was meritless and that the person asserting it knew or should have known that claim was meritless. Ala Code §§ 8-12A-2(d)(2) and (6). In addition, courts may consider the reasonableness of any license proposal, whether the demand letter is deceptive, and any other factors the courts find relevant. Ala.Code. §§ 8-12A-2(d)(4), (5), (7), and (8).

In Count II, DPCC alleges that Blazer has made and continues to make "bad faith claims of infringement of the '421 patent despite knowledge of DPCC's absolute intervening rights to side or offer for sale the Side Mounted Traps." (Dkt. 115 ¶ 42.) According to DPCC, Blazer's assertion that the Side-Mounted Traps infringe claims of the '421 patent was in "bad faith" in violation of Alabama Code §§ 8-12A-2(a) and (d) because Blazer knew—presumably based on the March 2 Letter—that DPCC had absolute intervening rights to sell those traps. (*Id.*)

As set forth above, though, DPCC never presented evidence supporting its contention that it had such absolute intervening rights, and to this day, still has not produced evidence establishing that all of DPCC's Side-Mounted Traps were manufactured prior to the date of reissue of the '421 patent, June 6, 2017. Indeed, DPCC never presented anything other than its opinion about those rights based on its insistence—unsubstantiated and untrue, based as it was on the misrepresentation

that wooden housings are Side-Mounted Traps—to claim that its Side-Mounted Traps were fully manufactured and in existence before June 6, 2017. But wooden housings are not "bee traps," and absent proof that DPCC made or acquired final, finished, fully manufactured Side-Mounted Traps prior to June 6, 2017, neither Blazer nor his former counsel had any reason to believe DPCC's misleading claim to absolute intervening rights. Thus, Blazer had no knowledge of DPCC's supposed absolute intervening rights and—perhaps more importantly—as the evidence now shows, DPCC did not have manufactured Side Mounted Traps and never had a claim to absolute intervening rights in them.

Moreover, Blazer's assertions of infringement were not "meritless" and were not made in bad faith. To the contrary, Blazer investigated and analyzed DPCC's Side-Mounted Traps, comparing those products to the reissued claims of his '421 patent. Based on these analyses, Blazer concluded reasonably and in good faith that DPCC's Side-Mounted Traps infringe his '421 patent, documenting his conclusions in claim charts. (Dkt. 159-11 at 12-17.)

Because Blazer did not have—and could not have had—knowledge that DPCC had absolute intervening rights to sell or offer for sale its Side-Mounted Traps, and because Blazer undertook an investigation and analysis of these accused products, including comparing DPCC's Side-Mounted Traps to the claims of his '421 patent, his assertions of infringement were at all times reasonable and in good

faith. Accordingly, Blazer respectfully requests that this Court enter summary judgment in Blazer's favor as to Count II of DPCC's Consolidated Complaint.

**C.      The Record Evidence and Undisputed Material Facts in this Case Establish Conclusively That None of Blazer's Accused Carpenter Bee Traps Infringe Any Claim of the '611 Patent and Blazer is Entitled to Judgment as a Matter of Law.**

In Count III, DPCC asserts that Blazer is liable of willful direct infringement of Claims 1, 4, and 6 of the '611 patent. (Dkt. 115, Count III at 14-15.) Specifically, DPCC alleges "Blazer has in the past directly infringed, and currently infringes, at least claims 1, 4 and 6 of the '611 Patent by selling or offering for sale carpenter bee traps called: (i) 'The Best Bee Trap'; (ii) 'The Simple Box Bee Trap'; (iii) 'The Super Carpenter Bee Condo'; (iv) the 'Cabin Style Bee Trap'; (v) the 'Tall Bee Trap'; (vi) the 'Large Bee Trap'; and (vii) the 'Milled Bee Trap.'"[3] (Dkt. 115 ¶ 45.)

Of the three claims of the '611 patent asserted by DPCC against Blazer, Claim 1 is the only independent claim. Each of Claims 4 and 6 depend from Claim 1, and therefore, incorporate each and every limitation of Claim 1. Accordingly, to infringe any of these claims of the '611 patent, Blazer's accused products must meet at least all of the limitations of Claim 1. Among its limitations, Claim 1 requires that the housing of the carpenter bee trap of the invention must "contain[ ] no bait." (Dkt.

---

[3] DPCC recently agreed that "Blazer is not liable for infringement" with respect to four of the carpenter bee traps that DPCC accused of infringement of the '611 patent in its Consolidated Complaint. (Dkt. 159-20 at 13 (Interrogatory No. 16).) Accordingly, this motion for summary judgment of noninfringement is directed only to the three remaining accused products, "The Best Bee Trap," "The Simple Bee Trap," and "The Super Carpenter Bee Condo."

159-4, col. 3, line 47.) The Court has construed the term, "bait," for purposes of the '611 patent to mean "a substance that attracts bees." (Dkt. 67 at 8.)

The only evidence in this case is that Blazer applied a proprietary blend of substances known to attract carpenter bees—i.e., bait according to this Court's construction—to every single carpenter bee trap he ever made, used, sold, or offered for sale. (Dkt. 159-7 (Dep. Tr. 94:1-95:16, 96:2-97:15, 99:2-105:14, and 123:6-130:12).) DPCC's own expert witness, Dr. George Rotramel, agreed the substances incorporated into Blazer's bait are attractants for carpenter bees. (Dkt. 159-14 (Dep. Tr. 13:22-132:14).) Despite no evidence contradicting Blazer's sworn testimony or supporting a reasonable conclusion that any of Blazer's accused product did not contain bait, DPCC continues to assert the '611 patent against Blazer.

Attempting to understand DPCC's continued assertion of infringement of the '611 patent, Blazer served an interrogatory (Interrogatory No. 17) seeking all factual and legal bases supporting DPCC's contention that Blazer infringed or currently infringes any claim of the '611 patent, including identification of all evidence on which DPCC intends to rely to prove that Blazer's accused products include housings that contain no bait. (Dkt. 159-20 at 13-14.) After initially interposing baseless objections and refusing to answer, DPCC stated that it would rely on (1) its

"preliminary infringement contentions served on Blazer on January 15, 2020,"[4] (2) "a letter dated March 8, 2016 sent by counsel for DPCC to Blazer," and (3) "the testimony or deposition of Clifford Davis, Anthony Robinson, Brian Blazer and the testimony or deposition Dr. George Rotramel [*sic*]." (*Id.* at 14.)

Notwithstanding that this "response" does not disclose the specific evidence on which DPCC intends to rely to establish that the accused Blazer carpenter bee traps incorporate each any every limitation in Claims 1, 4, and 6 of the '611 patent—including, in particular, the requirement that the traps contain no bait—none of these potential sources of evidence presents even the possibility of a genuine dispute as to whether the accused products contain bait.

First, DPCC's counsel's letter to Blazer dated March 8, 2016 (Dkt. 115-4), is entirely lacking as to evidence of whether the accused products contain no bait as recited by the asserted claims of the '611 patent. DPCC's counsel attached claim charts to that letter which purportedly show that three of Blazer's carpenter bee traps—the Best Bee Trap, the Simple Box Trap, and Super Carpenter Bee Condo—infringe Claims 1, 4, and 6 of the '611 patent. For the limitation requiring that the housings of the accused traps contain no bait, DPCC's counsel merely included

---

[4] Blazer is not aware of any "preliminary infringement contentions" served by DPCC on January 15, 2020 and assumes for purposes of his motion for summary judgment that DPCC in its answer to Interrogatory No. 17 means and refers to DPCC's Disclosure of Asserted Claims and Preliminary Infringement Contentions, served on Blazer on December 18, 2019.

photographs of a portion of the interior of the housings for the traps, presumably to show that these were empty. But that is hardly evidence that those accused traps included no substance that attracts carpenter bees. Moreover, DPCC's claim charts do not disclose or describe any analyses to determine whether the wood of each of the accused traps had been treated with and contained substances that attract carpenter bees, such as carpenter bee pheromones and/or certain wood scents. As DPCC's own expert witness acknowledged carpenter bees are attracted by pheromones and certain wood scents—substances that would not be shown in a photograph. (Dkt. 159-14 (Dep. Tr. 130:15-132:14).)

Second, DPCC's preliminary infringement contentions likewise do not disclose that DPCC undertook any analysis of the accused carpenter bee traps, then identified as the Best Bee Trap, Simple Box Bee Trap, Super Carpenter Bee Condo, Cabin Style Bee Trap, Tall Bee Trap, and Milled Bee Trap. (Dkt. 159-17 ¶¶ 1-2.) With regard to the limitation requiring that the housings contain no bait, DPCC once again relied on photographs purporting to show the interior of the housings of Blazer's accused traps. DPCC also cited information from Blazer's former Internet website on which he marketed those traps. This information, though, amounts to nothing more than instructions to users of Blazer's traps that they need not add any bait or other materials to the traps. As Blazer explained in his deposition, this is because all of his traps were "pre-baited." Because Blazer treated every trap he made

and sold with his proprietary mix of wood scents and bee pheromones, there was no need for users to add additional bait. (Dkt. 159-7 (Dep. Tr. 94:1-95:16, 96:2-97:15, 99:2-105:14, and 123:6-130:12).)

Third, DPCC suggests it will rely on the testimony of Anthony Robinson, who previously made and sold carpenter bee traps under license from Blazer. But Mr. Robinson provided no testimony at deposition that might reasonably constitute evidence that Blazer's accused traps did not contain bait. At most, Robinson testified that he observed Blazer and/or Blazer's employee making carpenter bee traps to his specification that he—*not* Blazer—subsequently sold or offered for sale. Robinson was absolutely clear and unequivocal that he *never* observed Blazer making traps that Blazer—or anyone else—ever sold or offered for sale. (Dkt. 159-13 (Dep. Tr. 30:20-31:7).) Thus, Mr. Robinson's deposition testimony presents no evidence that reasonably raises a dispute as to the fact—for which there *is* material evidence in the record—that all of Blazer's traps included bait.

Fifth, DPCC's intent to rely Clifford Davis Jr.'s testimony to support its contention that Blazer's traps contained no bait is unavailing. Mr. Davis never observed Blazer's manufacture of his traps so he cannot offer testimony to refute Blazer's evidence regarding the attractants he applied during manufacture of his traps. Mr. Davis also cannot testify that he analyzed or commissioned others to analyze Blazer's traps to determine whether they contained attractants as Blazer

37

testified. Certainly, if such analyses and tests were performed, DPCC would have produced the evidence of those analyses during discovery in this case so that it could be relied upon at trial or summary judgment. Moreover, DPCC would have disclosed the results of such analyses in its answer to Blazer's Interrogatory No. 17. Further, if Mr. Davis or DPCC had commissioned another person to perform analyses or tests of Blazer's traps—someone other than Dr. Rotramel, who admitted at deposition that he never analyzed, inspected, or even touched Blazer's accused traps—DPCC would have disclosed that person and his or her opinions pursuant to its obligations under Rule 26(a)(2). Mr. Davis, then, reasonably cannot dispute the record evidence here that compels the conclusion that Blazer's accused traps all contained bait and cannot infringe any claim of the '611 patent.

Finally, the testimony of DPCC's expert witness, Dr. George Rotramel, cannot raise a genuine issue of material fact. Dr. Rotramel presented no evidence regarding whether Blazer's accused products contained bait or that they infringed any claim of the '611 patent. In fact, Dr. Rotramel testified under oath that he had never personally inspected, studied, or had even seen or handled any of the accused Blazer traps at issue. (Dkt 159-14 (Dep. Tr. 137:22-24).) Dr. Rotramel also testified that he did not perform any analyses of those traps to determine whether they had been treated with an attractant. Indeed, he did not even smell any of those traps in an effort to learn whether there might have been an attractant applied to them, nor

did he conduct chemical analyses of the accused products. (*Id.* (Dep. Tr. 142:1-143:22).) Further, Dr. Rotramel never instructed anyone else to conduct analyses or to smell the traps. (*Id.*) Dr. Rotramel also admitted that he had no evidence that the accused products did not contain substances such as pheromones or wood scents, substances that he agreed were attractants for carpenter bees, but relied strictly on photographs and video presentations of the accused traps to form his opinions regarding infringement of the '611 patent. (*Id.* (Dep. Tr. 130:22-132:14 and 137:3-144:22).) To the extent Dr. Rotramel expressed as the opinion in his expert report that each of the accused Blazer traps do not contain bait, he admitted under oath that he simply assumed it was the case. (*Id.* (Dep. Tr. 142:12-15 and 144:7-22).)

Thus, DPCC has no "evidence" that the accused Blazer traps meet all of the limitations of each asserted claim of the '611 patent, including the requirement that the housings of Blazer's accused traps must contain no bait, i.e., must not include any attractant for carpenter bees. None of DPCC's "evidence" creates a genuine dispute as to the question of whether Blazer's accused traps contain bait.

The only competent evidence of record on this question is Blazer's sworn testimony, which establishes that all of Blazer's accused carpenter bee traps contained bait as the Court construed that term. Accordingly, those accused products do not and cannot infringe any claim of the '611 patent for at least the reason that they contained bait and every claim of that patent requires that the housing of the

carpenter bee traps of its invention contain *no* bait. Blazer is entitled to judgment as a matter of law that he did not infringe the '611 patent, and he respectfully requests that this Court enter summary judgment in his favor as to Count III of DPCC's Consolidated Complaint and as to Count I of Blazer's counterclaims.

### D. DPCC's '426 and '384 Patents Are Invalid as Indefinite.

To be valid, a patent must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2; *see also Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 902 (2014) (holding that lack of definiteness renders invalid "the patent or any claim in suit.") (citing 35 U.S.C. § 282, ¶ 2(3)). "[A] design patent is indefinite under § 112 if one skilled in the art, viewing the design as would an ordinary observer, would not understand the scope of the design with reasonable certainty based on the claim and visual disclosure." *In re Maatita*, 900 F. 3d 1369, 1377 (Fed. Cir. 2018). The "visual disclosure may be inadequate—and its associated claim indefinite—if it includes multiple, internally inconsistent drawings." *Id.* at 1375 (citing *Times Three Clothier, LLC v. Spanx, Inc.,* Case Nos. 13-cv-2157, 13-cv-7260, 2014 WL 1688130, at *7-9 (S.D.N.Y. 2014) (holding design patents invalid for indefiniteness because the drawings were inconsistent as to material aspects of the claimed design)).

Despite the Court's Scheduling Order that it serve its preliminary infringement contentions by December 18, 2019 (Dkt. 28 at 1), DPCC never

provided Blazer with any support or explanation for its allegations of infringement of the '426 and '384 patents. (Dkt. 159-17.) DPCC's failure to serve infringement contentions for either of these patents or to otherwise demonstrate or explain how they are infringed has prejudiced Blazer and further demonstrates that the '426 and '384 patents are not amenable to construction and are indefinite.

### 1. The Single Claim of the '426 Patent Cannot Be Logically Construed and is Indefinite.

As shown on the next page, the single claim of the '426 patent purports to claim two embodiments of a carpenter bee trap that are different in every material aspect. Embodiment 1 (Figs. 1-5) claims: (1) a top with sharp corners, (2) upwardly sloping entrance holes, (3) a box with sharp corners, (4) the joint line between boards, and (5) the base, lid and receptacle. Embodiment 2 (Figs. 6-10) claims: (1) a top with beveled corners, (2) a straight entrance hole, (3) a box with beveled corners, and *disclaims*: (4) the joint line between boards and (5) the base, lid and receptacle. A single claim cannot include visibly different features of the two embodiments and simultaneously claim and disclaim other features. *Maatita*, 900 F. 3d at 1375. Indeed, a carpenter bee trap cannot have: a top with *both* sharp and beveled corners, entrance holes that are *both* upwardly sloping and straight through, a box with *both* sharp and beveled corners, joint lines and *no* joint lines, and *include* and *not include* a base, lid, and receptacle.



| **Embodiment 1 (Fig. 1)** | Feature | **Embodiment 2 (Fig. 2)** |
|---|---|---|
| Sharp corners and edges (Figs. 1- 4) | ① **Box Top** | Beveled corners and edges (Figs. 6- 9) |
| Upwardly sloping (Figs. 1-3) | ② **Bee Entry Holes** | Straight Bore (Figs. 6- 8) |
| Sharp Corners (Figs. 1-3, & 5) | ③ **Box Corners** | Beveled Corners (Figs. 6- 8, & 10) |
| Claimed (Figs. 1- 3) | ④ **Joint Line** | "[N]o part of the claimed design" (Figs. 6- 8) |
| Claimed (Figs. 1- 3, & 5) | ⑤ **Base, Lid & Receptacle** | "[N]o part of the claimed design" (Figs. 6- 8, & 10) |

Because the single claim of the '426 patent cannot be logically construed, it, by law, "fail[s] to inform, with reasonable certainty, those skilled in the art [and the public] about the scope of the invention," and is invalid under 35 U.S.C. § 112 ¶ 2. *Nautilus,* 572 U.S. at 901-02.

### 2. The Single Claim of the '384 Patent Cannot Be Logically Construed and is Indefinite.

The single claim of the '384 patent purports to claim four embodiments of a carpenter bee trap. For example, as shown on below, Embodiments 1 and 4 are wholly inconsistent in their material aspects.



| Embodiment 1 (Fig. 1) | | Feature | Embodiment 4 (Fig. 4) |
|---|---|---|---|
| No side overhangs (Figs. 1, 2, 5 & 6) | ① | **Box Top** | Extends Past Sides (Figs. 20-25) |
| Between Back and Front (Figs. 1 & 4) | ② | **Side** | Full width of top (Figs. 20, 21, & 26) |
| Visible (Figs. 1 & 4) | ③ | **Edge of Front** | Hidden By Sides (Figs. 20, 21 & 26) |
| Side Visible/ Wide Lip (Figs. 1 & 4) | ④ | **Box Bottom** | Side Hidden/ Narrow Lip (Figs. 20, 21 & 26) |
| Claimed (Figs. 1, 2, 3, 4 & 6) | ⑤ | **Base, Lid & Receptacle** | "[N]o part of the claimed design" (Figs. 20-23 & 26) |
| Extends Past Sides (Figs. 1, 2, 3, 5 & 6) | ⑥ | **Back** | No side overhangs (Figs. 20-23) |

Embodiment 1 (Figs. 1-6) claims a back mounted trap with: (1) a "short" top, (2) "short" sides between the front and back, (3) visible side edges of the front, (4)

a bottom with visible side edges and a "wide" lip, (5) the base, lid and receptacle, and (6) an "extended back." In contrast, Embodiment 4 (Figs. 20-26) claims a top mounted trap with: (1) an "extended" top, (2) "long" sides that extend past the front, (3) hidden side edges of the front, (4) a bottom with hidden side edges and a "narrow" lip, and (6) a "short" back, and *disclaims*: (5) the base, lid and receptacle. Thus, like the '426 patent, the single claim of the '384 patent is invalid under 35 U.S.C. § 112 ¶ 2 for being directed to "multiple, internally inconsistent drawings." *Maatita*, 900 F. 3d at 1375; *see also* 572 U.S. 901-02.

## E.      DPCC's Accused Carpenter Bee Traps Infringe Blazer's '421 Patent.

Summary judgment of patent infringement is appropriate when, as in this case, there are no genuine factual dispute as to the features of the accused device. *Becton Dickinson & Co. v. C.R. Bard Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990); *see also Chemical Eng'g Corp. v. Essef Indus. Inc.*, 795 F.2d 1565, 1571 (Fed. Cir. 1986) (affirming summary judgment where, as here, the expert for the non-movant on summary judgment corroborated the movant's claim). DPCC's expert, Dr. Rotramel, testified (twice) that DPCC's AST, BM, Natural Bee, and Bottom Receptacle traps, and (once) that DPCC's ST traps include each and every limitation of Claims 13-15 and 17—meaning those traps infringe Claims 13-15 and 17 of the '421 patent. 35 U.S.C. § 271(a); *Microsoft Corp. v. Geotag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016) (citation omitted). (Dkt. 159-14 (Dep. Tr. 147:16-160:18).)

Viewing the same photographs shown on the following page, he confirmed that each of DPCC's traps are carpenter bee traps that include: a wooden entrance unit (C) with an upwardly sloped entrance hole extending from the outside to the inside of the entrance unit, sized and shaped to attract carpenter bees into the trap entrance unit (B) and an exit opening for providing an exit path from the interior of the trap entrance unit (D), and a receptacle adapter (lid or extensions (E)) located at the exit opening of the trap entrance unit that receive and attach to a removable clear or translucent receptacle (F) and allows light surrounding the trap to enter the interior of the trap entrance unit via the exit opening to attract carpenter bees into the receptacle (F). (Dkt. 67 at 10-11 and 17-24; Dkt. 159-3, col. 8, ll. 24-67; Dkt. 159-14 (Dep. Tr. 147:16-160:18); Dkt. 159-18 at 7-38; Dkt. 159-27 at 21.)



**Clockwise from top left: BM, ST, Bottom Receptacle, AST & Natural Bee Traps**

Dr. Rotramel also testified that the AST, BM, ST and Bottom Receptacle Traps include a top panel (G) that overhangs a side wall of the trap entrance unit (C) and that their receptacle adapters (lids (E)) are female threaded couplings that receive a receptacle (F) with a corresponding male thread, thereby also infringing Claims 16 and 20. (*Id.*)

Dr. Rotramel subsequently issued a new expert report on January 13, 2023, which supersedes his original report. (Dkt. 159-26 at 5-6 and 14 (Dep. Rough Tr. 14:9-17:5; 52:5-10); Dkt. 159-27 at 5-10.) In his new report, Dr. Rotramel withdrew his opinion of noninfringement as to all of DPCC's carpenter bee traps *except* the Natural Bee Trap. (Dkt. 159:26 at 14, 18, 20, 22, and 23 (Dep. Rough Tr. 49:5-51:6; 67:12-68:22; 73:17-74:1 81:22-82:8; 88:16-21).) And in his deposition regarding this new report, Dr. Rotramel once again testified that each of DPCC's accused ST, AST, BM, Bottom Receptacle, and Natural Bee trap products incorporate structure that meets each and every limitation of at least claims 13, 14, 15, 15, and 17 of the '421 patent, thereby undermining his opinion that the Natural Bee Trap does not infringe and admitting that all of those products literally infringe the '421 patent. (Dkt. 159-26 at 18-23 (Dep. Rough Tr. at 67:12-88:21); 159-27 at 47-52; 159-28 at 2-27.)

Thus, there no factual dispute that the AST, BM, ST, and Bottom Receptacle Traps infringe Claims 13-15, 16, 17 and 20, and that the Natural Bee Trap infringes

Claims 13-15 and 17—DPCC's expert confirmed that all elements of these claims are present in the accused devices. As discussed above, DPCC has not provided any evidence that it possessed completed Side-Mounted Traps prior to June 6, 2017, and therefore, is not entitled to absolute intervening rights as it has claimed. Thus, a grant of summary judgment in Blazer's favor is, therefore, appropriate.

## CONCLUSION

For the foregoing reasons, Defendant and Counterclaim Plaintiff Brian Blazer respectfully requests that this Court enter summary judgment in his favor and against Plaintiff and Counterclaim Defendant DPCC as to Counts I, II, III, VI, and V of DPCC's Consolidated Complaint (Dkt. 115), and as to Counts I, V, VI, and VII of Blazer's Counterclaims (Dkt. 117), and grant to Blazer all such other and further relief as is warranted and appropriate under the circumstances.

Respectfully submitted,

Date: January 31, 2023         /s/ *Joseph J. Jacobi*

Joseph J. Jacobi (admitted *pro hac vice*)
Hansen Reynolds LLC
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Telephone: (312) 265-2252
jjacobi@hansenreynolds.com

Jeremy Adelson (admitted *pro hac vice*)
Hansen Reynolds LLC
301 North Broadway, Suite 400
Milwaukee, Wisconsin 53202
Telephone: (414) 455-7676
jadelson@hansenreynolds.com

Steven M. Brom (ASB-25410N74B)
Bachus, Brom & Taylor, LLC
3536 Independence Drive
Birmingham, Alabama 35209
Telephone: (205) 970-6747
Facsimile: (205) 970-7776
sbrom@bachusbrom.com

*Counsel for Defendant Brian Blazer*
*d/b/a Carpenter Bee Solution*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of January 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

C Gregory Burgess
Jeremy A. Smith
L. Franklin Corley, IV
LANIER FORD SHAVER & PAYNE, P.C.
2101 West Clinton Avenue, Suite 102
P O Box 2087
Huntsville, AL 35805
cgb@lanierford.com
jas@lanierford.com
lfc@lanierford.com

Ambria L Lankford
KEN PERRY LAW FIRM, LLC
1615 Financial Center
505 20th Street North
Birmingham, AL 35203
all@kenperrylawfirm.com

 /s/ *Joseph J. Jacobi*
*Attorney for Defendant Brian Blazer,*
*d/b/a Carpenter Bee Solutions*

49